NATIONAL ORNAMENT & ELECTRIC LIGHT CHRISTMAS ASSOCIATION, INC., et al., Appellees,

v.

CONSUMER PRODUCT SAFETY COMMISSION et al., Appellants.

No. 619, Docket 75–6122.

United States Court of Appeals Second Circuit.

Argued Dec. 2, 1975.

Decided Dec. 10, 1975.

Richard P. Caro, Asst. U. S. Atty. (David G. Trager, U. S. Atty., E. D. N. Y.; Josephine King, Asst. U. S. Atty., and Norman Barnett, Consumer Product Safety Comm., of counsel), for appellants.

Aaron Locker, New York City (Aberman, Greene & Locker, and David Greene, New York City, of counsel), for appellees.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

In this action in the District Court for the Eastern District of New York, wherein federal jurisdiction was predicated on 28 U.S.C. §§ 1331 and 1337, a trade association of manufacturers and distributors of Christmas light decorations, and a number of such manufacturers and distributors, sought declaratory and injunctive relief with respect to the conduct by the Consumer Product Safety Commission (CPSC or the Commission) of what, by Order 9010.83, dated November 5, 1975, it had designated as a "Consumer Deputy Program—Retail Survey of Christmas Decorative Lights" (the Program). The complaint, accompanied by a request for a temporary restraining order and a preliminary injunction, was filed on November 10, 1975, the very day on which the Program was to become effective. After hearing argument, Chief Judge Mishler, who was in the midst of a trial, granted, on November 12, the preliminary injunction with respect to three proposed screening methods designed to discover defects not apparent on visual examination but denied it as to two methods relating to defects that were apparent. The Commission appealed. Another panel of this court denied a stay but, because the program was to be conducted during the Christmas season, set an exceedingly expedited schedule. After hearing argument on December 2, 1975, we entered an order in which we reversed the injunction, directed that the mandate issue forthwith, and stated that an opinion would follow.

The Commission has enlisted the aid of a number of citizens whose concern with consumer product safety has prompted them to enroll as "Consumer Deputies" in order to assist the Commission in carrying out the difficult tasks with which Congress has entrusted it. The purpose of this Program, as stated in the order, was to utilize these deputies to supplement CPSC's inspection efforts with "surveys of retail outlets for Christmas decorative lights which have been identified as containing defects which may present substantial hazards as defined in Section 15(a) of the Consumer Product Safety Act."[1]

1. The Act, 86 Stat. 1207 (1972), appears at 15 U.S.C. § 2051 *et seq.*

The Commission's order went on to recite as background that in past Christmas seasons it had received numerous reports of electrical shock and fire or potential fire incidents from defective Christmas lights; that manufacturers, importers, and retailers had been notified of potential hazards and urged to inspect existing stocks; and that the Program was intended further to alert retailers to potential hazards of Christmas lights and to methods for checking their own stock for them. The objectives of the Program were stated to be:

a. To ascertain whether retailers are aware of possible hazards with Christmas decorative lights in their stock.

b. To inform retailers of the potential hazards of Christmas decorative lights and of methods for checking lights in stock for these hazards.

c. To provide feedback as to the types and volume of Christmas decorative lights seen at the retail level as compared to those identified by the field survey of manufacturers.

d. To make the public aware of potential hazards of certain Christmas decorative lights through publicity of this program.

The method of operation, as set forth in the Order and Appendices, was this: The deputies, who were to receive prescribed training, were instructed that they had no authority beyond that of any consumer and must not describe themselves as employees of CPSC. Armed with an illustrated booklet titled "What Can You Do Now and How Should You Do It?" and with a set of lights that had been arranged to reveal the hazards, they were to enter stores engaged in the sale of Christmas lights and state that they were there to explain potential hazards and to demonstrate methods for the retailer's checking of his lights. If the retailer permitted, they were to demonstrate these methods, five in number, with the set of defective lights that had been supplied them, and were to survey the lights in stock on shelves and fill out a report to the Commission identifying them. However, they were not themselves to examine the lights for defects. The deputies were also instructed that, before leaving, they were to ask the retailer whether he intended to inspect the lights, suggest that any lights found on such an inspection to have hazards be removed, and notify him that information on their survey would be turned over to CPSC and that an official follow-up might result. The report forms furnished to the deputies to fill out were to include the items described in the margin.[2] At the end of the Program each deputy was to prepare a final report to the Commission which would summarize the individual reports and comment on various aspects of the Program.

After the hearing, but before the issuance of the decision here on review, the Commission modified its directives to meet some of the objections that had been raised. The new instructions provided, in part, that "No Deputy shall in any manner advise a retailer to remove any item from inventory for any reason." In addition, deputies were provided with a new Letter of Introduction, to be given to the retailer, which stated:

The Commission's purpose in conducting this program is purely informa-

---

**2.** (1) Name and address (including zip code) of the retail outlet; whether store was a member of a chain or privately owned.

(2) Name and title of person interviewed; store department; date.

(3) Whether the manager allowed the hazard identification demonstration to be given.

(4) List all the different brands on display, along with identification . . . ..

(5) Record whether the manager had checked his stock for potential hazards prior to the deputy's visit. If not, does he/she plan to do so now.

(6) Comments. If a manager does not allow the survey to be conducted and/or the demonstration to be given, note here giving any reasons.

tional to assist it in promoting product safety by sharing its knowledge of certain potential defects which have been found in Christmas tree lights through past Commission surveys. The Commission has not, as of this date, undertaken any regulatory or legal action against any manufacturer, distributor, importer or private labeler of Christmas tree lights other than to inform them of the potential hazards which have been identified and to request that they take voluntary action to insure that their products do not contain any such defects.

Whatever may have been the case earlier, a subject on which we express no opinion, the Program as revised appears on its face to be entirely proper. Section 15(b)(2) of the Act requires, *inter alia*, that every retailer of a consumer product distributed in commerce "who obtains information which reasonably supports the conclusion that such product . . . contains a defect which could create a substantial product hazard described in subsection (a)(2)"[3] shall immediately inform the Commission of such defect unless he has actual knowledge that the Commission has been adequately informed. The objective of the Program was to insure that retailers would not remain supine until defects came to their attention as the result of a consumer complaint or an accident, but would be encouraged to engage in inspection before sale. Thus, deputies were instructed to give retailers, along with the booklet outlining the five tests, a copy of "Fact Sheet No. 32," which stated in part:

Business has a responsibility to report to the Commission any product defect which could create a substantial risk of injury to consumers.

The Consumer Product Safety Act states that manufacturers, importers, distributors, and retailers must immediately inform the Commission if any product . . . contains a defect that could create a substantial product hazard.

The "Fact Sheet" also detailed the procedure to be used in reporting a potential hazard, and a telephone number to call in order to give an immediate notification. Particularly in light of the findings and purposes of the Act as declared in § 2, the authorization to the Commission in § 5 to develop product safety information, and the directive in § 6(c) that it "shall communicate to each manufacturer of a consumer product, insofar as may be practicable, information as to any significant risk of injury associated with such product," the Program was legal, indeed laudable, unless some other provision of the Act forbade.

■ The district judge, acting under acute pressure of time, concluded that § 7, dealing with the promulgation of consumer product safety standards, applied to this case so far as concerned three of the screening methods which were designed to discover defects not visible by surface inspection. The unique provisions of § 7, dealing with the development of consumer product safety standards, and the further administrative procedures stipulated in § 9 for the promulgation of consumer product safety rules, generally in accordance with 5 U.S.C. § 553,[4] are of considerable complexity and exceedingly time-consuming; admittedly they were not here followed. But what the Commission has sought to accomplish by the Program is far different from the promulgation of product safety standards and rules. No ban has been placed on the sale of plain-

---

3. This is defined as:
   a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public.

4. An important exception is that the Commission must "give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions," § 9(a)(2).

tiffs' products, as in *Clever Idea Co. v. CPSC*, 385 F.Supp. 688 (E.D.N.Y.1974), which has been cited to us. The Consumer Deputies do not require anybody to do anything; they merely supply a prod to retailers to acquire information of the sort the retailers would be obliged to transmit to the Commission if they obtained it without the prod. While the acquisition of information by the retailers through shelf inspection before sale, rather than as a result of customer complaint after it, may lead to earlier return of defective goods, it should also provide greater protection to the public. Furthermore, the earlier transmission of such information to the Commission pursuant to § 15(b)(2) and by it to the manufacturer pursuant to § 6(c) is in the interest of the manufacturer as well as of the public.

■ Plaintiffs seek to support the injunction on the alternative basis of § 6(b)(1) of the Act which we quote in the margin.[5] The short answer is that the reports of the Consumer Deputies to the Commission will not disclose anything even to it except what manufacturers have stocked what lights with what retailers, and the Commission is not proposing to make public disclosure either of that or of reports of the retailers concerning defects which the visits of the Consumer Deputies may stimulate.[6]

Contrast *GTE Sylvania Inc. v. CPSC*, 404 F.Supp. 352 (D.Del.1975). The disclosure to the manufacturer of defects discovered by retailers creates no legal injury to him and is not within the protection of § 6(b)(1). Whether or not such retailer reports would be available to a requesting person under the Freedom of Information Act, 5 U.S.C. § 552(a)(3), but see § 552(b)(7), a matter on which we express no opinion, their accumulation by the Commission would not violate § 6(b)(1) of the Consumer Safety Protection Act; also see § 6(a)(1).

■ Although plaintiffs make some glancing reference to deficiencies in some of the five recommended tests, the record before the district court was inadequate to permit any findings on that score and the judge made none. We leave this issue open for further consideration by the district court if plaintiffs desire to press the point, although with serious reservations whether such judicial review is available. As the case was presented to the district court, the claim was that the Program defied procedural requirements of the Act; all that is now left is whether some of the testing methods to be demonstrated by the Consumer Deputies were badly designed. Broad as is the APA's definition of "agency action," 5 U.S.C. § 551(13), for which 5

---

**5.** Except as provided by paragraph (2) of this subsection, not less than 30 days prior to its public disclosure of any information obtained under this Act, or to be disclosed to the public in connection therewith (unless the Commission finds out that the public health and safety requires a lesser period of notice), the Commission shall, to the extent practicable, notify, and provide a summary of the information to, each manufacturer or private labeler of any consumer product to which such information pertains, if the manner in which such consumer product is to be designated or described in such information will permit the public to ascertain readily the identity of such manufacturer or private labeler, and shall provide such manufacturer or private labeler with a reasonable opportunity to submit comments to the Commission in regard to such information. The Commission shall take reasonable steps to assure, prior to its public disclosure thereof, that information from which the identity of such manufacturer or private labeler may be readily ascertained is accurate, and that such disclosure is fair in the circumstances and reasonably related to effectuating the purposes of this Act. If the Commission finds that, in the administration of this Act, it has made public disclosure of inaccurate or misleading information which reflects adversely upon the safety of any consumer product, or the practices of any manufacturer, private labeler, distributor, or retailer of consumer products, it shall, in a manner similar to that in which such disclosure was made, publish a retraction of such inaccurate or misleading information.

**6.** The revised instructions specifically stated:

No Deputy shall make any statement which would tend to identify any specific brand name product or the manufacturer, private labeler, distributor or retailer of any product.

U.S.C. § 704 affords review, it hardly seems broad enough to include a suggestion of what tests of plaintiffs' products should be made by retailers; the fact that the Commission initiated the Program by what it termed an order scarcely brings it within the definition when the "order" is simply an instruction to the Consumer Deputies how to conduct themselves vis-à-vis the retailers and what to report to the CPSC. If the designation of the suggested tests is agency action, it may well be of the sort "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). The issuance of the instructions is not "made reviewable by statute" and seems to be a long way from constituting "final agency action" in the sense that the CPSC is doing or proposing to do anything to the plaintiffs. The validity of the tests seems more analogous to the F.D.A. regulation held not subject to pre-enforcement review in *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–65, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), than to the regulations that were held reviewable in *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), and *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). See also the discussion in *Pepsico, Inc. v. F. T. C.*, 472 F.2d 179, 185–87 (2 Cir. 1972), *cert. denied*, 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973). If any of the tests are invalid, this can be developed in a proceeding under § 6(b)(1) before the CPSC publicly discloses the test results and they can also be challenged in any rulemaking proceeding based upon them. Recognizing that any agency investigation entails a risk that it will develop some material which is erroneous yet which will somehow leak out before statutory procedures can be complied with, but weighing this danger against the need for protecting the public against unsafe products, we find it difficult to believe that the Congress which enacted the Consumer Safety Protection Act would have wished the courts to interfere with the Commission's work on any ground other than failure to follow pre-scribed procedures at so early a stage as the Program here at issue. However, since this question has not been briefed or argued, we leave the matter with these observations and will not direct dismissal of the complaint.

The order granting a partial injunction is reversed.