## PHARMACEUTICAL MANUFACTURERS ASSOCIATION

v.

**Donald KENNEDY, Commissioner of Food and Drugs, Leonard D. Schaeffer, Administrator Health Care Financing Administration, Joseph A. Califano, Jr., Secretary of Health, Education and Welfare, United States of America.**

Civ. No. Y–78–2449.

United States District Court, D. Maryland.

May 21, 1979.

George W. Liebman, Baltimore, Md., Joel E. Hoffman, Daniel F. O'Keefe, Jr., D. Michal Freedman, Martha C. Salvant, Washington, D. C., for plaintiff; Bruce J. Brennan, and Edwin C. Mulcahy, Jr., Washington, D. C., of counsel.

Russell T. Baker, Jr., Robert B. Schulman, Baltimore, Md., and Arthur E. Korkosz, Washington, D. C., for defendants; Richard M. Cooper, Donald O. Beers, Rockville, Md., and Robert C. Farrell, Washington, D. C., of counsel.

JOSEPH H. YOUNG, District Judge.

## I. BACKGROUND

The Pharmaceutical Manufacturers Association ("PMA"), a nonprofit membership association of prescription drug manufacturers, filed a complaint seeking injunctive and declaratory relief against the Secretary of Health, Education, and Welfare and his delegates, the Commissioner of Food and Drugs and the Administrator of the Health Care Financing Administration ("HCFA") on December 6, 1978. Plaintiff's complaint begins by alleging a government-sponsored effort "to remake the existing competitive structure of the prescription drug industry," Complaint, ¶ 1, and seeks to prevent what it views as the government's promotion of pharmaceuticals which are less expensive than those brand name products manufactured by PMA's member firms. According to plaintiff, the government is attempting to accomplish its end through two routes. First, the Food and Drug Administration ("FDA") has given notice that it intends to publish a list of Therapeutically Equivalent Drugs providing comparisons among various pharmaceuticals containing identical generic active ingredients. Plaintiff claims that such a list would be misleading since it would be based upon undocumented and inaccurate *quality* comparisons among particular products. Second, HCFA plans to publish a Guide to Prescription Drug Prices, which, according to plaintiff, is "based upon irrelevant, incomplete and inaccurate wholesale price data, [and] depicts the use of specifically identified drug products of named manufacturers as significantly more expensive to the consumer than the use of imitative products containing the same generic active ingredients or in the same supposed therapeutic class (Complaint, ¶¶ 30–40)." Plaintiff's Memorandum in Response to Motion to Dismiss, at 3. Arguing that defendants lack the necessary statutory authority to issue these publications, plaintiff seeks injunctive and declaratory relief against their issuance. Since the factual statements in the proposed Drug List and Price Guide are alleged to be "inaccurate, misleading and falsely disparaging," *id.* at 4, plaintiff argues that such publications, if authorized, must be preceded by the proper rulemaking and adjudicatory proceedings to assure the obtaining of accurate factual determinations.

Initially both the Drug List and Price Guide were scheduled for final publication without any prior administrative proceedings by the FDA or HCFA. On June 30,

1978, the Commissioner of Food and Drugs announced that a list "identify[ing] therapeutically equivalent products" was "scheduled to be completed in late summer." 43 Fed.Reg. 28557 (1978). HEW Secretary Califano issued a press release on August 10, 1978 stating that the Price Guide's "final version" would be distributed to some 350,000 physicians and pharmacists in January, 1979. After this suit was filed, however, Secretary Califano held a press conference announcing that the Drug List would be the subject of a notice-and-comment rulemaking proceeding under the Administrative Procedure Act, 5 U.S.C. § 553.

The FDA published its proposed rulemaking notice in the January 12, 1979 Federal Register. 44 Fed.Reg. 2932 (1979). Comments have been solicited on the "proposed policy of making such a list available as well as the current content and form of the list itself." Although defendants stated in their Memorandum accompanying their Motion to Dismiss that notice of similar rulemaking would be published by HCFA in relation to its proposed Price Guide, no such notice has been given. Plaintiff, citing an article appearing in the pharmaceuticals trade press, notes that HCFA currently still intends to distribute up to 500,000 copies of the Price Guide—an action which would have an effect even greater than the distribution initially contemplated by Secretary Califano. See *Washington Drug and Device Letter,* Vol. II, No. 8, pp. 1–2 (February 19, 1979).

Defendants have moved to dismiss on two grounds: (1) that plaintiff has failed to exhaust proper administrative remedies, and (2) that because of the absence of any "final agency action," the issues raised by the complaint are not currently ripe for judicial review.

In response to defendants' motion, plaintiff has suggested a "pragmatic solution" by which PMA would be willing to dismiss its complaint without prejudice at this time provided that the Court impose suitable protective conditions ensuring PMA's ability to renew its challenge to the proposed publications without having forfeited its op-

portunity to secure injunctive relief. These sanctions, drafted by plaintiff for the Court's approval and included in plaintiff's proposed voluntary dismissal order, read as follows:

1. That ten working days in advance of public distribution, release or availability of the documents themselves, defendants publish in the Federal Register notices of intent to promulgate final versions of the List of Therapeutically Equivalent Drugs and Guide to Prescription Drug Prices.

2. That each notice of intent include a summary of each type of comment submitted on the proposal, the agency's conclusions with respect to each type of comment, and a thorough and comprehensible articulation of the reasons for the agency's decision on each issue.

3. That the Guide to Prescription Drug Prices to be proposed by defendants be publicized by notice in the Federal Register of its availability, with actual copies distributed solely upon request.

Defendants have rejected PMA's proposed pragmatic solution and have renewed their original motion to dismiss.

## II. THE PRESENCE OF "AGENCY ACTION"

The scope of judicial review of administrative actions is set forth in the Administrative Procedure Act ("APA") which allows such review of "'[a]gency action made reviewable by statute and final *agency action*." 5 U.S.C. § 704 (emphasis added). Additionally, section 702 requires that in order to achieve standing to obtain judicial review, a party must be "adversely affected or aggrieved by *agency action.*" (emphasis added). It is quite clear that not every "action" or activity undertaken by an agency constitutes "agency action" within the statutory context. Generally, for an action to qualify as being subject to judicial review it must satisfy the APA's statutory definition of "agency action" which includes

"the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Promulgating a rule[1] through rulemaking proceedings,[2] issuing an order[3] through an adjudication,[4] taking action substantively affecting a license,[5] and imposing a sanction[6] are all acts falling within the statutory scheme. While courts have been reluctant to be more precise than the APA provisions, most courts which have tackled the question have proceeded on a case-by-case basis. 5 B. Mezines, J. Stein, & J. Gruff, Administrative Law § 43.01, at 43–4 (1978).

Although the defendants have voluntarily agreed to conduct traditional rulemaking proceedings in order to generate as much public involvement as possible in the publication of this information, this Court has serious reservations as to whether even with this turn of events the FDA and HCFA may be said to have undertaken "agency action." One treatise frames the issue in this fashion:

> The terms an agency applies to its acts are irrelevant for purposes of determining if there is agency action. Simply because an agency refers to its act as an order, does not mean that it has issued an order within the meaning of the Administrative Procedure Act. Conversely, when an agency issues an interpretation of its organic statute, it has issued a rule, regardless of whether the agency calls it a rule.

B. Mezines, J. Stein, & J. Gruff, *supra*, § 43.01 at 43–9 through 43–10. *See, e. g., National Ornament & Electric Light Christmas Ass'n, Inc. v. Consumer Product Safety Commission*, 526 F.2d 1368 (2d Cir. 1975); *Independent Broker-Dealers' Trade Association v. Securities and Exchange Commission*, 142 U.S.App.D.C. 384, 389–95, 442 F.2d 132, 137–43, *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971). In *National*

*Ornament,* the court apparently interpreted "agency action" in terms of its realistic effect rather than its nominal designation:

> Broad as is the APA's definition of "agency action," 5 U.S.C. § 551(13), for which 5 U.S.C. § 704 affords review, it hardly seems broad enough to include a suggestion of what tests of plaintiffs' products should be made by retailers; the fact that the Commission initiated the Program by what it term[s] an order scarcely brings it within the definition when the "order" is simply an instruction to the Consumer Deputies how to conduct themselves vis-à-vis the retailers and what to report to the CPSC. If designation of the suggested tests is agency action, it may well be the sort "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). The issuance of the instructions is not "made reviewable by statute" and seems to be a long way from constituting "final agency action" in the sense that the CPSC is doing or proposing to do anything to the plaintiffs.

526 F.2d at 1372–73. *Crowther v. Seaborg*, 312 F.Supp. 1205, 1214–16 (D.Colo.1970), illustrates the converse situation where the court found the agency to have issued an order even though no such specific reference was made.

The defendants move for dismissal upon exhaustion and ripeness grounds; however, both of these arguments are premised upon the pendency or ultimate completion of agency *rulemaking* activity which satisfies the "agency action" definition. The Court is convinced that dismissal is warranted for a more fundamental reason, namely, the absence of any reviewable "agency action."

An early case interpreting the scope of "agency action" is *Hearst Radio, Inc. v. Federal Communications Commission*, 83 U.S.App.D.C. 63, 167 F.2d 225 (1948) (Prettyman, J.). In *Hearst,* the Federal Commu-

---

1. 5 U.S.C. § 551(4).

2. 5 U.S.C. § 551(5).

3. 5 U.S.C. § 551(6).

4. 5 U.S.C. § 551(7).

5. 5 U.S.C. § 551(8) and (9).

6. 5 U.S.C. § 551(10).

nications Commission had published a report entitled the "Public Service Responsibility of Broadcast Licensees," also known as the "Blue Book," in which it was alleged that certain misrepresentations amounting to libel were directed against WBAL, one of plaintiff's radio stations. Among the relief sought by plaintiff was a declaratory judgment to the effect that it had a right to have the charges made in the Blue Book withdrawn. Claiming that publication of the charges constituted a "legal wrong," plaintiff argued that APA § 10(a), 5 U.S.C. § 702, provided judicial review to any person injured by an administrative agency action. Since no special statutory review proceeding for an act such as publication was contained in the APA, plaintiff brought its action under APA § 10(b), 5 U.S.C. § 703. The Court of Appeals affirmed the district court's judgment that the publication was not "agency action":

The difficulty with the appellant company's position is that the Administrative Procedure Act does not provide judicial review for everything done by an administrative agency. The language of the Act is: "Any person suffering legal wrong because of any *agency action* * * shall be entitled to judicial review thereof." (Italics supplied.) The term "agency action" in that provision is not a general term with the all-embracive meaning usually conveyed by those words, but is a term defined in the statute. The statutory definition is: " 'Agency action' includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

83 U.S.App.D.C. at 65, 167 F.2d at 227.

A more recent case illustrating the same point is *Illinois Citizens Committee for Broadcasting v. Federal Communications Commission*, 169 U.S.App.D.C. 166, 515 F.2d 397 (1975), where the court addressed the question of what constitutes a reviewable "final order" of the Federal Communications Commission ("FCC"). *See* 28 U.S.C. § 2342(1). At issue was whether a speech by FCC Chairman Burch to the National Association of Broadcasters' annual convention indicating his approval of a resolution condemning sexually oriented radio call-in shows was a "final order" of the FCC. The court concluded that:

28 U.S.C. § 2342(1) (1970) provides for review in the courts of appeals of "all final orders" of the FCC. This Court has said that "to be final an order must 'impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process.' " *Bethesda-Chevy Chase Broadcasters, Inc. v. FCC*, 128 U.S.App.D.C. 185, 186, 385 F.2d 967, 968 (1967), *quoting Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corporation*, 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948). The FCC's Memorandum Opinion and Order is a final order within the meaning of that statute. It refuses to withdraw the Notice of Inquiry and Notice of Apparent Liability, thereby "denying the rights" asserted by Petitioners under the First Amendment and 47 U.S.C. § 326 (1970).

The speech by Chairman Burch, however, is not a "final order" of the FCC. Indeed, it is not FCC action at all, but merely represents the unofficial expression of the views of one member of the Commission. It is not a decisional pronouncement affecting legal rights and obligations in the manner contemplated by this court in *Bethesda-Chevy Chase Broadcasters*. It is not "agency action" for purposes of the Administrative Procedure Act, 5 U.S.C. § 702 (1970).

169 U.S.App.D.C. at 171, 515 F.2d at 402. A case the following year, however, indicated that where a speaker acts in his official capacity using words intended as a "regulatory pressure mechanism," there is reviewable agency action. *Writers Guild of America, West, Inc. v. Federal Communications Commission*, 423 F.Supp. 1064 (C.D. Cal.1976). *See* B. J. Mezines, *et al., supra*, § 43.01, at 43–5. Sworn testimony in the *Writers Guild* case, however, revealed that the Burch speech at issue in *Illinois Citizens* was in fact intended as a regulatory device having resulted from a Commission vote to use the speech in that fashion. 423 F.Supp.

at 1120–23. Nevertheless, the principle of *Illinois Citizens* remains sound despite the incorrect characterization of its facts. *See also Independent Broker-Dealers, supra.*

Cases which have found instances of "agency action" in contexts similar to the one now under consideration have typically presented situations where the agency planned to release data submitted to it by a private party who subsequently claimed that release of the information would have an adverse effect upon the party, thereby entitling him to judicial review. In *Sears, Roebuck & Co. v. General Services Administration*, 384 F.Supp. 996 (D.D.C.), *aff'd*, 166 U.S.App.D.C. 194, 509 F.2d 527 (1974), Sears sought to prevent disclosure to intervenor Council on Economic Priorities of EEO–1 forms and affirmative action plans submitted by nineteen Sears branches to defendant General Services Administration and the Labor Department's Office of Federal Contract Compliance pursuant to federal requirements. Sears claimed disclosure would be harmful and sought judicial review of its claims. Finding that judicial review was appropriate, the court reasoned as follows:

> A decision to release information is no less susceptible to court review than a decision to deny disclosure; indeed courts in this circuit have expended great amounts of energy dealing with FOIA cases. And it is settled in this circuit that the APA is a waiver of sovereign immunity. Thus it seems clear that an agency decision to release data submitted to the agency by a private party is an "agency action" adversely affecting that private party and entitling that party to judicial review.

384 F.Supp. at 1001 (footnotes omitted).

Two principal observations can be made which distinguish the present case from *Sears, Roebuck* in light of the case law cited earlier. First, to find "agency action" when information release is involved there must be release of information by the agency which has been supplied by or originated with the party seeking judicial review. Second, the person seeking such review must be adversely affected in terms of what the APA calls a "legal wrong."

Nowhere does PMA allege that it supplied the information proposed for release in either the Drug List or the Price Guide. The information contained in the Drug List includes a list of approved drug products found by the FDA to be safe and effective as well as therapeutically equivalent to each other.[7] The HCFA Price Guide includes information obtained from an HEW-sponsored survey of pharmacy invoice prices based on a sample of 1000 retail pharmacies. Other prices were obtained from manufacturers' catalogues or from advertisements in the *Drug Topics Redbook*. The draft HCFA Price Guide also included an individual drug's unit price as well as the average daily dose and daily therapy cost.[8] On the record as developed so far, there is nothing to indicate that the Drug List and Price Guide do any more than list or compile data which has already been obtained via statutory procedure or solicited informally through survey and other sampling techniques. No breach of confidence arises from the compilation and release of this data by an agency. Moreover, agency re-

---

7. The legal authority to issue the Drug List may be found in section 310 of the Public Health Service Act, ("PHSA"), 42 U.S.C. § 242o, which directs the Secretary of HEW to issue "information related to public health, in the form of publications or otherwise, for the use of the public," and to publish "other pertinent health information for the use of persons and institutions concerned with health services." *See also* 21 C.F.R. 5.1(a)(2). Section 311(a) of the PHSA also directs the Secretary of HEW to advise the several states as to public health matters (21 C.F.R. 5.1(a)(2)), as well as under section 705(b), 21 U.S.C. § 375(b), to provide information to the public concerning drugs in situations posing "imminent danger to health, or gross deception of the consumer." 21 C.F.R. 5.1(a)(1).

These legal authorities have been developed more fully in the Preamble announcing the rulemaking proceedings in connection with the Drug List. 44 Fed.Reg. 2932, 2934–36 (1979) [hereinafter cited as Preamble].

8. The daily therapy cost is calculated by multiplying the unit price by the average daily dose.

lease of this information is undoubtedly a public service in the public interest.[9]

The notice in the Federal Register concerning the proposed Drug List listed three general considerations behind the FDA's decision to make available a list of therapeutically equivalent drug products:

(1) Education of users of drug products, i. e., those who purchase, prescribe, or dispense drug products, as well as the patients for whose benefit the drug products are used.

(2) Cooperation with the States in carrying out their duties to protect and promote the health and welfare of their citizens.

(3) Facilitation of the President's program to control inflation in the American economy.

44 Fed.Reg. 2932 (1979).[10]

The version of Approved Drug Products prepared in January, 1979 states in its Introduction that the findings as to therapeutic equivalence evaluations are proposals only:

on the application of certain criteria, described below, to information contained in FDA files to make these nonregulatory evaluations.

The agency desires that the list be as well-informed as possible because of the public interest in the importance of the information it could contain. Issuance of the list would be significant activity by FDA, and the agency believes that it would profit from public participation during its development. Therefore, this notice is being published to solicit comments and suggestions on all aspects of the list, including the legal authority, rationale, and criteria for the evaluation of therapeutic equivalence. Because the list is not a rule, as defined in the Administrative Procedure Act (5 U.S.C. 551(4)), adherence to the rulemaking procedures of that statute (5 U.S.C. 553) is not required. Nevertheless, these procedures provide a useful model for the agency to present a proposal and request public comments on it.

44 Fed.Reg. 2932, 2937 (1979).

**9.** The Preamble to the Drug List explains that its purpose is one of information gathering and dissemination only:

The proposed FDA list of approved drug products, with evaluations on their therapeutic equivalence, would contain only public information and advice. This list would not constitute an order or a rule; it would neither determine nor adjudicate the legal rights of any drug manufacturer or distributor; it would impose no requirement or restriction upon any person; it would not interpret or apply the act in a manner that creates any obligation on any person; it would make no recommendation as to which products persons should purchase, prescribe, or dispense, or conversely, which products should be avoided.

To the extent that the list identifies drug products approved for marketing under sections 505 and 507 of the act (21 U.S.C. 355 and 357), it would merely set forth information to which the public is entitled under the Freedom of Information Act. (See 21 CFR 20.117; 314.14; and 431.71). Omission of a drug product from the list would not necessarily mean that the drug product is in violation of section 505 and 507 of the act, or that it is not safe or effective, or that it may not be therapeutically equivalent to other drug products. Decisions on whether specific drug products are subject to the requirements.of either of those sections, or whether specific drug products have fulfilled those requirements, are made in clearly defined proceedings unrelated to the release of information on approval decisions. (See e. g., 21 CFR 314.100 and Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973).)

To the extent that the list sets forth FDA's evaluations of the therapeutic equivalence of drug products that have been approved, it would contain FDA's advice to the public and to the States regarding an important public health matter. These evaluations would not constitute determinations that any products are in violation of the act or that any products are preferable to others. They are based

**10.** Other considerations which prompted the FDA's decision were: (1) cooperation with the Federal Trade Commission in developing a "Model State Drug Product Selection Act;" (2) the likelihood of confusion over the legal status of certain drug products; (3) the need to provide more information concerning "man-in-the-plant" practices whereby some brand name drug manufacturers will contract with a second firm to manufacture their products but continue to sell virtually identical products at substantial price differentials; (4) to encourage voluntary compliance activities with the FDA Compliance Policy Guide for issuing new drugs; and (5) to implement the 1974 recommendation of the Congress' Office of Technology Assessment's Drug Bio-equivalence Study Panel which proposed the creation of an official list of drug products evaluated for therapeutic equivalence.

For more detail as to these considerations, see Preamble, supra, note 7, 44 Fed.Reg. 2932, 2934–36 (1979).

This volume provides a complete list of prescription drug products that have been specifically approved for marketing by the Food and Drug Administration (FDA). In addition, it contains proposed evaluations of therapeutic equivalence for certain of these drugs. These evaluations have been prepared to promote public education in the area of product selection, to foster containment of health costs, and to serve state health agencies in the administration of their laws relating to generic substitution. The criteria for therapeutic equivalence evaluations, and the evaluations themselves for specific drugs, are presented as proposals rather than final Agency determinations so that interested parties may review and comment on them. FDA desires that the list be as well informed as possible because of the public interest in it and the importance of the information it contains. A more complete discussion of the background and basis of the Agency's proposed policies relating to therapeutic equivalence of drug products and of the procedures for submitting comments on these policies are contained in an announcement published in the *Federal Register* of January 12, 1979. All information in this list is public and available under the Freedom of Information Act. For several years there has been a trend toward repeal of anti-substitution legislation that once was common in most states. In addition, a number of states have recently adopted laws intended to encourage the substitution of one product of a particular drug entity for another, with the intent of saving money for the consumer and containing costs in drug procurement and medical reimbursement programs. These state laws generally require that either substitution be limited

to drugs on a specific list (the positive formulary approach) or that substitution be permitted for all drugs except those prohibited by a particular list (the negative formulary approach).

█ PMA might possibly contend that the findings as to therapeutic equivalence constitute adverse actions affecting its members' interest; however, it remains undisputed that no agency is ordering any PMA member to engage in or refrain from any action. Nor is any agency doing anything which is binding on the parties. *International Telephone & Telegraph Corporation v. Local 134*, 419 U.S. 428, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975). PMA asserts that therapeutic equivalency determinations [11] will be misleading in that undocumented and false quality comparisons among drugs will serve to confuse consumers who will then be persuaded against their better interests to sacrifice quality for low costs. PMA, however, will have an opportunity to dispute any findings on equivalency both at the proposal stage and after the FDA has made its final determination. Throughout this entire process, the agency has made it clear that its primary interest is public disclosure. Since no "agency action" is planned and no compliance by any PMA member is contemplated or required, there is no "agency action" within the meaning of 5 U.S.C. § 704 which this Court can review.

There are obvious similarities between the present case and the situation presented in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), which involved a First Amendment challenge to a state law prohibiting licensed pharmacists from advertising prescription prices. Recognizing that the First Amend-

11. "Therapeutic Equivalents" has been defined as follows:

Therapeutic equivalents—Drug products are considered to be therapeutic equivalents if they are pharmaceutical equivalents and can be expected to give the same therapeutic effect when administered to the patient under the conditions specified in the labeling. The concept of therapeutic equivalence, as used

in developing these lists, applies only to products containing the same active ingredients and does not encompass a comparison of pharmaceutical alternatives or two different active ingredients used for the same disease (e. g., propoxyphene HCl and pentazochine for the treatment of pain).

*See also* 21 C.F.R. 320.1(c).

ment guaranteed an individual's access to such information, the Supreme Court explained that suppression of price information had an adverse impact upon society's most disadvantaged members:

> As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate. Appellees' case in this respect is a convincing one. Those whom the suppression of prescription drug price information hits the hardest are the poor, the sick, and particularly the aged. A disproportionate amount of their income tends to be spent on prescription drugs; yet they are the least able to learn, by shopping from pharmacist to pharmacist, where their scarce dollars are best spent. When drug prices vary as strikingly as they do, information as to who is charging what becomes more than a convenience. It could mean the alleviation of physical pain and the enjoyment of basic necessities.

425 U.S. at 763, 96 S.Ct. at 1826–27 (footnote omitted). Noting that while "society . . . may have a strong interest in the free flow of commercial information," the Supreme Court then rejected the paternalistic approach (also advanced by PMA in this case) founded upon the notion that disclosure would be harmful overall:

> It appears to be feared that if the pharmacist who wishes to provide low cost, and assertedly low quality, services is permitted to advertise, he will be taken up on his offer by too many unwitting customers. They will choose the low-cost, low-quality service and drive the "professional" pharmacist out of business. They will respond only to costly and excessive advertising, and end up paying the price. They will go from one pharmacist to another, following the discount, and destroy the pharmacist-customer relationship. They will lose respect for the profession because it advertises. All this is not in their best interest, and this can be avoided if they are not permitted to know who is charging what.

There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. If they are truly open, nothing prevents the "professional" pharmacist from marketing his own assertedly superior product, and contrasting it with that of the low-cost, high-volume prescription drug retailer. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways. Cf. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering.

425 U.S. at 769–70, 96 S.Ct. at 1829.

Quite obviously a finding of therapeutic equivalence between two drugs will not automatically mean that the higher priced commodity will no longer be purchased. For example, the average shopper is no doubt aware of the difference between brand name cereals and the generally cheaper generic labels available on the same shelf, but not all consumers automatically opt for the cheaper version. If they did, Madison Avenue would be out of business overnight. Consumers purchase a given item for all sorts of reasons, although as inflation gathers steam, price sensitivity is increasingly becoming a more prominent factor. Whereas a shopper can determine the salient characteristics of and differences between brand name peas and "off-brand" peas, even physicians and pharmacists may not readily know the therapeutic equivalence of certain drugs or their comparative

prices. The food shopper who seeks the "best for less" can readily determine the cheapest item and can then rely on his own values as to what item he considers the best and at what price. Recent cases have demonstrated that in pharmaceuticals, *Virginia State Board of Pharmacy, supra,* and legal services, *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 *reh. denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977), consumers need additional information before they can even begin to attempt meaningful value comparisons among purchases.

To retard release of the Drug List and Price Guide by characterizing them as challengeable "agency actions" creating a legal wrong would be to hamper the free flow of information vital to efficient economic decisionmaking by consumers. If PMA and its members will be adversely affected by release of this information the effect will come not from any agency action but rather from consumers' choices.

### III. PLAINTIFF'S PROPOSED "PRAGMATIC SOLUTION"

As defendants point out, to grant plaintiff's proposed "pragmatic solution," *supra,* would have the effect, inter alia, of giving PMA a ten day temporary restraining order in a suit which would not have been filed. Once the Drug List and Price Guide become final, there is no basis for withholding them for an additional ten day period. If PMA fears that release of such information will adversely affect its members, then at the appropriate time it should file for a temporary restraining order and seek further injunctive relief.

Plaintiff claims that an advance-notice requirement in this case accords with the deferred effectiveness requirement of APA § 4(c), 5 U.S.C. § 553(d):

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

Plaintiff cites the *Attorney General's Manual on the Administrative Procedure Act* 37 (1947) which explains that "[t]he purpose of the time lag required by section 4(c) is to 'afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of the rules may prompt.'" In response, defendants submit that both the Drug List and Price Guide lack an effective date, and the reason for this omission is simple: the documents are not "rules" in the first place. Plaintiff presumably could invoke the delayed effectiveness requirement if there were some agency action involved here in the first place. Since there is none, plaintiff's argument that publication, the so-called functional equivalent of effectiveness, is the harm to be avoided lacks merit.

Plaintiff cites four cases for the claim that "[b]efore such information with a potential for causing competitive harm to its submitter may be released outside the agency, the affected company is frequently required to be notified of the agency's intentions in sufficient time for the firm to seek appropriate judicial relief." Plaintiff's Memorandum in Response to Motion to Dismiss at 13. *See, e. g., In re FTC Line of Business Report Litigation,* 193 U.S.App. D.C. 300 at 321–322, 595 F.2d 685 at 706–707 (1978) (affirming protective order requiring 10 days' advance notice of FTC decision to publish individual company data); *FTC v. Texaco, Inc.,* 180 U.S.App. D.C. 390, 412, 555 F.2d 862, 884 (*en banc*), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 *reh. denied,* 434 U.S. 883, 98 S.Ct. 250, 54 L.Ed.2d 168 (1977) (judicial approval of FTC proposal for 10 days' advance notice of disclosure of subpoenaed data); *Aluminium Co. of America v. United States Department of Justice,* 444 F.Supp. 1342, 1347 (D.D.C.1978) (protective order requiring 5 days' notice of final Justice deci-

sion to disclose confidential documents obtained in response to civil investigative demand); *FTC v. United States Pipe and Foundry Co.,* 304 F.Supp. 1254 (D.D.C.1969) (approving order of FTC hearing examiners forbidding public disclosure of subpoenaed documents for 10 days). Each of these cases, however, presents a set of facts in which the party seeking the delayed documentary disclosure had itself submitted the data which had been designated confidential to the agency. In *Texaco, Inc., supra,* the court specifically noted that in imposing a delay even under these conditions it was "not herein adopting a rule of general applicability for a 10-day notice provision. It is rather adopting for purposes of this case a proposal for confidentiality advanced by FTC . . . ." 180 U.S.App.D.C. at 412, 555 F.2d at 884 n.64. Similarly, in *Aluminium Co., supra,* the protective order was warranted in light of plaintiff's substantial production of many confidential documents. Furthermore, in *In re FTC, supra,* the court found that data submitted by corporations in compliance with the FTC's Line of Business ("LB") survey and its Corporate Patterns Report ("CPR") survey was not solicited pursuant to the agency's rulemaking authority:

> appellants maintain that since the LB and CPR data will be used for regulatory purposes, the collection of the data itself is a prescription of law or policy within the meaning of the rule definition. We agree with the District Court that appellants' argument proves too much. [*In re FTC Corporate Patterns Report Litigation,* 432 F.Supp. 291]. 432 F.Supp. at 302. If the collection of information is considered a prescription of law or policy because of the possible regulatory uses to which the information may be put, then all types of compulsory process the product of which may be put to regulatory use—including subpoenas—would similarly require rulemaking.

193 U.S.App.D.C. at 310, 595 F.2d at 695. Like the instant case, the agency in *In re FTC* had exercised its discretionary authority "to permit greater procedural access" by allowing opportunity for the public

to become involved in the LB and CPR survey programs, and this action did not mean that rulemaking or "agency action" had been commenced. *Id.* 193 U.S.App. D.C. at 311 n.55, 595 F.2d at 696 n.55.

PMA has not submitted any confidential documents which might, under the rationale of these "advance notice" cases, permit it to seek a protective order delaying disclosure. To grant plaintiff's request along these lines would be to allow special intervention by an interest group after the agency had made its final determination and was on the verge of releasing its compilations. PMA has no special claim to this information which would justify the court granting an "advance notice" limitation at this juncture. For similar reasons, the Court finds no compelling reasons for granting plaintiff's second condition mandating advance release of the explanatory preambles to the publications. Such limited advance disclosure simply is unnecessary once the publications, which plaintiff keeps referring to as "rules", are put into their final form.

Plaintiff also wants to require HCFA to follow "normal rulemaking procedures" as to the proposed Price Guide. Since HCFA has already committed itself to following APA rulemaking procedures, plaintiff argues, it should be prevented from undertaking an agency-initiated mass mailing of the proposed Price Guide. "Such a mass mailing would effectively short-circuit proper rulemaking procedures, because no comments subsequently submitted to HFCA [sic] could diminish the practical impact of the proposed version once it is so broadly distributed." Plaintiff's Memorandum in *Response to Motion to Dismiss* at 16.

One of the central purposes of the rulemaking procedure is to invite written comments from interested parties who may be affected by certain agency rules. The instant case presents a situation in which hybrid rulemaking procedures are being employed and where the final outcome is not "agency action." In neither the pure nor hybrid rulemaking context, however, should agency-initiated solicitation of comments face discouragement. As an alterna-

tive to policy-making through adjudication, rulemaking has been characterized as "one of the greatest inventions of modern government." K. C. Davis, Administrative Law Text 142 (1972). The goal of rulemaking is to generate the discussion and comment crucial to informed democratic decisionmaking:

> Affected parties who know facts that the agency may not know or who have ideas or understanding that the agency may not share have opportunity by quick and easy means to transmit the facts, ideas, or understanding to the agency at the crucial time when the agency's positions are still fluid. The procedure is both democratic and efficient.

*Id.* Surely an agency, which solicits comments from the general public through publication in the *Federal Register*, can only hope to benefit all the more from information it seeks out itself from parties which it knows are interested. Democracy does not mandate purely passive rulemaking or haphazard information-gathering. What is at stake here is the generation and dissemination of consumer information which is essential to informed, rational economic decisionmaking.

President Carter has likewise endorsed a more affirmative, aggressive part by agencies in encouraging increased public participation. To this end, he signed Executive Order No. 12,044 on March 23, 1978 which deals with "Improving Government Regulations." Under the provisions of this Order encompassing reform of the *process* for developing "significant regulations," the President has promulgated the following directive:

> (c) *Opportunity for Public Participation.* Agencies shall give the public an early and meaningful opportunity to participate in the development of agency regulations. They shall consider a variety of ways to provide this opportunity, including (1) publishing an advance notice of proposed rulemaking; (2) holding open conferences or public hearings; (3) sending notices of proposed regulations to publications likely to be read by those affected; and (4) *notifying interested parties directly.*

Exec.Order No. 12,044, 43 Fed.Reg. 12,661 (1978) (emphasis added). With this endorsement of agency-initiated solicitation of comments in the rulemaking context, there surely can be no harm in encouraging similar activities in the present context.

## IV. THE EXHAUSTION AND RIPENESS ARGUMENTS

■ Assuming *arguendo* that the Court's reasoning as to the absence of any "agency action" were inapplicable, the Court would still have to dismiss plaintiff's complaint on exhaustion and ripeness grounds. While it is true that exhaustion is discretionary rather than jurisdictional, *Taylor v. Cohen*, 405 F.2d 277, 280–81 (4th Cir. 1968) (*en banc*), the Supreme Court has recognized that "[t]he basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972). At this point, the agency proceedings are still at the proposed stage, and plaintiff has cited no authority which would permit this Court to fashion some form of interim relief during pending administrative proceedings. *See* B. J. Mezines, *et al., supra,* § 49.03.

Furthermore, plaintiff's alleged harm is only speculative, and, as reasoned above, would result from the independent decisions of consumers and not from anything which a federal agency had mandated. There is no actual controversy, no direct or immediate harm which would justify this Court's intervention now. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 152–53, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Since there is no final agency action subject to review pursuant to 5 U.S.C. § 704, *Toilet Goods Association, Inc. v. Gardner*, 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the Court must agree with defendants' arguments that the issues raised by plaintiff are not ripe for judicial review.

Accordingly, it is this 21st day of May, 1979, by the United States District Court

for the District of Maryland, ORDERED: that plaintiff's complaint be, and the same is, hereby DISMISSED.