THE PRESBYTERIAN CHURCH (U.S. A.), et al., Plaintiffs–Appellants,

v.

The UNITED STATES of America, et al., Defendants–Appellees.

No. 86–2860.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1987.

Decided March 15, 1989.

As Amended April 13, 1989.

Peter D. Baird, Lewis and Roca, Phoenix, Ariz., for plaintiffs-appellants.

Mary P. Mitchell, Trial Atty. (argued), Richard K. Willard, Asst. Atty. Gen., John J. Farley, III, and Gordon W. Daiger, Attys. (on brief), U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellees.

Before NORRIS, KOZINSKI * and LEAVY, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

The plaintiffs in this action are Alzona Evangelical Lutheran Church, Camelback United Presbyterian Church, Southside United Presbyterian Church, Sunrise United Presbyterian Church, and their two national parent denominations, The Presbyterian Church (U.S.A.) and the American Lutheran Church (hereafter referred to collectively as "the churches"). The churches brought this action against the United States, the Department of Justice, the Immigration and Naturalization Service ("INS") and several individual INS officers,[1] claiming that the churches' First and Fourth Amendment rights were violated when INS agents entered the churches wearing "body bugs" and surreptitiously recorded church services. The district court granted the defendants' motion to dismiss on a variety of grounds. We af-

firm in part and reverse in part, and remand to the district court with instructions to consider, in light of this opinion, whether the churches retain standing to pursue their claims and whether their claims are moot.

## I

## BACKGROUND

In early 1984, the INS initiated an undercover investigation of the sanctuary movement, an effort by a loosely knit group of clergy and lay people to aid refugees from El Salvador and Guatemala.[2] From approximately March 1984 to January 1985, several INS agents wearing "body bugs" infiltrated four Arizona churches. The investigations were conducted without search warrants and without probable cause to believe that the surveillance of the churches would uncover evidence of criminal activity. The agents attended and surreptitiously tape recorded several services including an ecumenical worship service offered by the Camelback and Sunrise Presbyterian Churches in Phoenix, regular Sunday morning worship services at Southside Presbyterian Church in Tucson, and Bible study classes at Alzona Lutheran Church in Phoenix. During the surveillance the agents recorded prayers, hymns, and Bible readings.

The covert surveillance of the church services was made a matter of public record during the criminal prosecution of several individuals who were involved with the sanctuary movement. After the INS surveillance of the churches was disclosed in the criminal proceedings, the four churches brought this civil rights action.

In their complaint, the churches claimed that the defendants violated the First Amendment by abridging the churches' right to free exercise of religion and their freedom of belief, speech, and association.

---

\* Judge Kozinski was drawn to replace Judge Anderson, who died while the case was under submission.

**1.** For convenience, we sometimes refer to the defendants collectively as "the INS."

**2.** For the purposes of this appeal, we accept as true the allegations in the churches' complaint.

They also claimed that the INS' surveillance of the churches without a warrant supported by probable cause constituted an illegal search under the Fourth Amendment. The churches sought nominal damages against the individual INS agents involved in the surveillance, a declaratory judgment that the INS surveillance was unconstitutional, and injunctive relief prohibiting the INS from engaging in such surveillance in the future without a "prior established and compelling governmental interest." Excerpts of Record ("E.R.") Tab 15 at 24.

The district court granted the defendants' motion to dismiss on several grounds. First, the district court held that the churches lacked standing to raise the First Amendment claim. Next, it ruled that the churches had failed to state a claim under Fourth Amendment.[3] Finally, the court ruled that the doctrine of qualified immunity barred the churches from recovering damages against the individual INS agents named as defendants, and that sovereign immunity barred all relief against the United States, the Department of Justice and the INS.

The churches' appeal raises questions of law which we review *de novo*.[4]

## II

## FIRST AMENDMENT STANDING

In holding that the churches lacked standing to raise their First Amendment claim, the district court reasoned that the First Amendment protects "rights guaranteed to individuals not corporations" because "the churches don't go to heaven." E.R. Tab 58 at 57, 29. To the contrary, it is settled law that churches may sue to vindicate organizational interests protected by the free exercise clause of the First Amendment. *See, e.g., Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). On appeal, the INS does not dispute that in appropriate circumstances churches may raise free exercise claims on their own behalf as organizations, but argues that the churches here have failed to allege that they have suffered an injury sufficient to establish standing in this case. We disagree, and hold that the injuries alleged in the complaint are an adequate foundation for standing in this case.[5] However, as we explain below in Part V, because we are unable to assess the likelihood that the INS will repeat its surveillance of the churches in the future, we remand to the district court for a determination of whether the churches have standing to seek prospective relief.

For the churches to bring a claim on their own behalf, they must show " '[1] that [they have] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and [2] that the injury 'fairly can be traced to the challenged action' and [3] 'is likely to be redressed by a favorable decision'...." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). We believe the churches' allegations satisfy all three of these requirements.

First, we are persuaded that the churches have alleged actual injuries as the result of the INS' conduct. For example, they allege that as a result of the surveillance of worship services, members have

---

**3.** The district court also dismissed a claim brought by the churches under the Fifth Amendment, which the churches do not pursue on appeal.

**4.** Although the district court treated the INS' motion to dismiss as one for summary judgment, it does not appear to have relied on matters outside the pleadings. We therefore confine our review to the contents of the complaint, and take all the allegations therein as true. *Fort*

*Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir.1984).

**5.** The churches argue that in addition to having standing to sue to vindicate their own organizational interests, they have standing to sue in a representational capacity on behalf of their members. Because we hold that the churches have standing to sue on their own behalf, it is unnecessary for us to decide whether they may also sue in a representational capacity.

withdrawn from active participation in the churches, a bible study group has been canceled for lack of participation, clergy time has been diverted from regular pastoral duties, support for the churches has declined, and congregants have become reluctant to seek pastoral counseling and are less open in prayers and confessions. *See* Complaint ¶¶ 48, 54, 60, E.R. Tab 13.

The INS contends that the churches have alleged injury to individual worshippers, but have failed to allege injury to themselves as organizations. We disagree. When congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them and taping their every utterance, all as alleged in the complaint, we think a church suffers organizational injury because its ability to carry out its ministries has been impaired.

The INS replies, however, that in any event, the alleged injuries to the churches are too "speculative" and "conjectural" to satisfy the Article III case or controversy requirement. The INS contends that the alleged chilling effect on the congregants, and the resulting impact on church worship, are not cognizable injuries because they do not derive from "coercive action" by the INS. Brief of Appellees at 9. In arguing that such injuries are not constitutionally cognizable, the INS relies on *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

In *Laird*, plaintiffs challenged the Army's domestic surveillance of peaceful civilian political activity. The alleged injury was a " 'chilling' effect on the exercise of their First Amendment rights" caused, not by any specific action of the Army directed against the plaintiffs, but only by "the existence and operation" of the surveillance program in general. *Id.* at 3, 92 S.Ct. at 2320. The plaintiffs in *Laird* alleged only that they could conceivably become subject to the Army's domestic surveillance program. *Id.* at 13, 92 S.Ct. at 2325. The Supreme Court held that the plaintiffs lacked standing because they had failed to set forth "a claim of specific present objective harm or a threat of spe-

cific future harm." *Id.* at 14, 92 S.Ct. at 2326.

Although *Laird* establishes that a litigant's allegation that it has suffered a subjective "chill" does not necessarily confer Article III standing, *Laird* does not control this case. The churches in this case are not claiming simply that the INS surveillance has "chilled" them from holding worship services. Rather, they claim that the INS surveillance has chilled *individual congregants* from attending worship services, and that this effect on the congregants has in turn interfered with the churches' ability to carry out their ministries. The alleged effect on the *churches* is not a mere subjective chill on their worship activities; it is a concrete, demonstrable decrease in attendance at those worship activities. The injury to the churches is " ' "distinct and palpable." ' " *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (citations omitted). *Laird* has no application here.

Our conclusion is supported by *Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). In *Keene*, the plaintiff, a political officeholder, sued to prevent the government from designating as "political propaganda" some films he was sponsoring. He alleged that such a designation would make the films offensive to the public, thereby hurting his reputation and career. The Court, rejecting the government's argument that the plaintiff lacked standing under *Laird*, held that this alleged injury was sufficient for standing purposes. The Court noted that Keene would not have standing if he alleged only that *he* had suffered a "subjective chill" because of the government action. 481 U.S. at 473, 107 S.Ct. at 1867. But that was not all Keene was alleging. He alleged that his constituency was " 'influenced against him' " because of the propaganda classification, and that it was therefore much more difficult for him to continue his political career. This was enough for the Court. *Id.* at 475. In our view, the churches have suffered harm analogous to the "reputational" or "professional" harm

that was present in *Keene.* Thus, the INS' reliance on *Laird* is misplaced.[6]

If, therefore, the churches can in fact prove their allegations of a decrease in congregants' participation in worship services and other religious activities, of the cancellation of a Bible study class, of the diversion of clergy energy from pastoral duties, and of congregants' reluctance to seek pastoral counseling, they would establish that the surveillance of religious activity has directly interfered with the churches' ability to carry out their religious mission. Churches, as organizations, suffer a cognizable injury when assertedly illegal government conduct deters their adherents from freely participating in religious activities protected by the First Amendment. *Cf. NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 463–65, 78 S.Ct. 1163, 1172–73, 2 L.Ed.2d 1488 (1957). The alleged injuries are not speculative; they are palpable and direct. Therefore, we conclude that the churches have satisfied the requirement of alleging "actual or threatened injury" as a result of the INS' conduct. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

Second, we consider whether the churches have shown that the alleged injury " 'fairly can be traced to the challenged action.' " *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. The churches have alleged that the INS has confronted their congregants with the threat that their prayers and other religious expressions will be seen and recorded by the watchful eyes and ears of government and perhaps be kept on file in government records. According to the churches' allegations, knowledge of this threat has deterred congregants from participating fully in religious observances, and has thereby impaired the churches' ability to carry out their religious missions. Clearly, this injury to the churches can "fairly be traced" to the INS'

conduct. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

Third, the churches' injury is likely to be "redressed by a favorable decision." *Id.* A judicial determination that the INS surveillance of the churches' religious services violated the First Amendment would reassure members that they could freely participate in the services without having their religious expression being recorded by the government and becoming part of official records. The requested relief would thus redress the injury to the churches caused by the INS surveillance.

In sum, we hold that the churches have alleged a cognizable injury which is traceable to the INS surveillance and which is likely to be redressed by a favorable decision on the merits. However, as we are unable to assess the likelihood that the churches will be subject to INS surveillance in the future, we are unable to determine whether they have standing to seek prospective relief against such surveillance. *See LaDuke v. Nelson,* 762 F.2d 1318 (1985), *modified on other grounds,* 796 F.2d 309 (9th Cir.1986); *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As we explain in Part V *infra,* we must remand to the district court for a determination on this issue.

### III

### SOVEREIGN IMMUNITY

The churches contend that the district court erred in holding that their claims for declaratory and injunctive relief against the United States, the Department of Justice, and the INS are barred by sovereign immunity. We reverse the district court on this issue, because we agree with the churches that § 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702

---

**6.** The INS attempts to support its argument that *Laird* controls this case by citing *Fifth Avenue Peace Parade Committee v. Gray,* 480 F.2d 326 (2d Cir.1973). In that case, plaintiffs, the organizers of an anti-war demonstration, challenged on First Amendment grounds an FBI investigation of individuals associated with the demonstration. The court held that, under *Laird,* the plaintiffs lacked standing. However, as in *Laird,* the plaintiffs' injury involved in *Fifth Avenue Peace Parade Committee* was only a subjective chill. The churches' alleged decrease in membership is a concrete harm rending the present case distinguishable from *Fifth Avenue Peace Parade.*

(1982), waives sovereign immunity for the churches' claims for relief other than money damages.

At the outset, we note that the question is not whether § 702 creates jurisdiction for the churches' claims. The churches properly invoke federal jurisdiction under 28 U.S.C. § 1331 because their claims arise out of the Constitution. The relevant question is whether § 702 waives sovereign immunity for the churches' non-monetary claims. We hold that it does.

Section 702 reads:

A person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

Section 702 acquired its current form in 1976, when Congress amended it to add the second sentence. The clear objective of the 1976 amendment was to waive sovereign immunity as a defense in actions seeking relief other than money damages. *See, e.g., Schnapper v. Foley,* 667 F.2d 102, 107–08 (D.C.Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982). Congress was quite explicit about its goals of eliminating sovereign immunity as an obstacle in securing judicial review of the federal official conduct. Reasoning that "[c]ourts can make a useful contribution to the administration of Government by reviewing the legality of administrative conduct which adversely affects private persons," H.Rep. No. 1656, 94th Cong., 2d Sess. 5, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6121, 6125, Congress noted

that "great strides" toward making government accountable to citizens had already been made in the Federal Tort Claims Act and the Tucker Act, and that the amendment to § 702 was designed to "strengthen this accountability by withdrawing the defense of sovereign immunity in actions seeking relief other than money damages, such as an injunction, declaratory judgment, or writ of mandamus." *Id.* at 6124. Congress observed that before the amendment to § 702, litigants seeking such nonmonetary relief were forced to resort to the "legal fiction" of naming individual officers, rather than the government, as defendants, *id.* at 6125,[7] an approach that was "illogical" and "becloud[ed] the real issue whether a particular governmental activity should be subject to judicial review, and, if so, what form of relief is appropriate." *Id.* at 6128–29. The need to channel and restrict judicial control over administrative agencies, Congress concluded, could better be achieved through doctrines such as statutory preclusion, exhaustion, and justiciability, rather than through "the confusing doctrine of sovereign immunity." *Id.* at 6130. Accordingly, § 702 was designed to "eliminate the defense of sovereign immunity as to any action in a Federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of the agency." *Id.* at 6123.

■ The INS argues, and the district court agreed, that § 702 does not waive sovereign immunity for the INS conduct challenged in this case. The INS' argument is that § 702's waiver of sovereign immunity applies only to "agency action" as defined by the APA, and that the challenged investigative activity does not constitute "agency action" within the APA definition. The INS' argument is premised on the first sentence of § 702, enacted in 1946, which reads: "A person suffering legal wrong because of any *agency action,* or adversely affected or aggrieved by such

---

**7.** Congress was doubtless referring to *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and its progeny.

action within the meaning of any relevant statute, shall be entitled to judicial review thereof." 5 U.S.C. § 702 (emphasis added). The INS contends, on the basis of this language, that § 702 waives sovereign immunity only for "agency action"—that is, "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13) (defining "agency action"). The INS argues that, because its investigation of the churches does not fit this definition of "agency action," § 702's waiver of sovereign immunity does not apply to this suit.

We cannot agree with the INS that § 702's waiver of sovereign immunity is limited to instances of "agency action" as technically defined in § 551(13).[8] It may well be true that in its original 1946 form, when it contained only the sentence quoted above, § 702 limited judicial review to suits challenging "agency action" thus defined. But the 1976 amendment to § 702 contains no such limitation. On its face, the 1976 amendment is an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable.[9] Nothing in the language of the amendment suggests that the waiver of sovereign immunity is limited to claims challenging conduct falling in the narrow definition of "agency action":

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States....

Thus, on its face, the 1976 amendment to § 702 waives sovereign immunity in all actions seeking relief from official misconduct except for money damages. The INS'

attempt to restrict the waiver of sovereign immunity to actions challenging "agency action" as technically defined in § 551(13) offends the plain meaning of the amendment.

Moreover, nothing in the legislative history of the 1976 amendment of § 702 suggests that Congress intended to limit the waiver of sovereign immunity to the specific forms of "agency action" enumerated in § 551(13). On the contrary, Congress stated that "the time [has] now come to eliminate the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity." H.Rep. No. 1656, 94th Cong., 2d Sess. 9, *reprinted in* 1976 U.S. Code Cong. & Admin.News 6121, 6129 (emphasis supplied). Congress singled out types of government conduct similar to the alleged INS conduct in this case—"tax investigations" and "control of subversive activities"—as appropriate for judicial review under the amended version of § 702. The INS fails to point to any evidence in the legislative history even suggesting that Congress meant anything other than what it plainly said in the 1976 amendment: that an action for nonmonetary relief challenging an agency for "acting or failing to act" shall not be barred by sovereign immunity. This waiver was clearly intended to cover the full spectrum of agency conduct, regardless of whether it fell within the technical definition of "agency action" contained in § 551(13).

It is particularly significant that Congress referred disapprovingly to the *Ex parte Young* fiction, which permitted a plaintiff to name a government official as the defendant in equitable actions to redress government misconduct, on the pretense that the suit was not actually against the government. By invoking the *Young* fiction plaintiffs could, even before Con-

---

**8.** Because we hold that § 702's waiver of sovereign immunity is not limited to suits challenging "agency action," we need not decide whether the alleged INS surveillance in this case constituted "agency action" within the meaning of § 551(13).

**9.** This court has previously held that the 1976 amendment to § 702 waives sovereign immunity not only for suits brought under § 702 itself, but for constitutional claims brought under the general federal-question jurisdiction statute, 28 U.S.C. § 1331. *Beller v. Middendorf*, 632 F.2d 788, 797 (9th Cir.), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1980).

gress amended § 702 in 1976, maintain an action for equitable relief against unconstitutional government conduct, whether or not such conduct constituted "agency action" in the APA sense. *See, e.g., Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689–91, 69 S.Ct. 1457, 1461–62, 93 L.Ed. 1628 (1949); *U.S. v. Yakima Tribal Court,* 806 F.2d 853, 859 (9th Cir. 1986); *Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C.Cir.1984). Congress' plain intent in amending § 702 was to waive sovereign immunity for all such suits, thereby eliminating the need to invoke the *Young* fiction.

Our reading of § 702 as amended in 1976 also makes sense in terms of the structure and animating concerns of the APA. In urging us to limit the scope of § 702 to review of "administrative action" as opposed to "investigative activity," the INS argues that "[t]he discrete acts that comprise an investigation, being *ad hoc* in nature, are entirely different from"—and, by implication, less deserving of judicial scrutiny than—"that genus of governmental activity referred to in [§ 551(13)], where the emphasis is on governmental action that results from a particular procedure mandated by statute or regulation." Brief of Appellees at 41, 44. This argument is unpersuasive. It is true that the APA is largely concerned with regulatory commands and the processes by which agencies arrive at them. The emphasis in § 551(13)'s definition of "agency action" on final regulatory decisions such as orders and rules is consonant with the APA's extensive specifications for *regularizing the processes* by which administrative orders or commands are created. However, much of the APA is concerned with *limiting the intrusiveness* of administrative agencies' behavior in order to protect the privacy and autonomy of groups and individuals affected by the regulatory process. *See, e.g.,* 5 U.S.C. §§ 552, 552a, 552b (1982). Indeed, Congress has specifically created, and provided for judicial enforcement of, a general prohibition on the keeping of records on "how any individual exercises rights guaranteed by the First Amendment." 5 U.S.C. § 552a(e)(7). It would be anomalous—inexplicable in terms of the structure of the APA, and in evident conflict with the plain language and legislative history of the amendment to § 702—to read § 702 as preserving sovereign immunity in claims for equitable relief against government investigations alleged to violate First and Fourth Amendment rights.

Finally, the cases cited by the INS do not support its assertion of the sovereign immunity defense in this case. None is persuasive authority for the proposition that § 702's waiver of sovereign immunity is limited to government conduct that fits within the definition of "agency action" in 5 U.S.C. § 551(13). Indeed, many of them have nothing to do with § 702's waiver of sovereign immunity, but rather are concerned with the definition of "final agency action" reviewable under *§ 704* of the APA, 5 U.S.C. § 704. *See, e.g., Geyen v. Marsh,* 775 F.2d 1303, 1308 n. 6 (5th Cir. 1985); *American Trucking Ass'n v. United States,* 755 F.2d 1292, 1296–97 (7th Cir. 1985); *National Ornament & Electric Light Christmas Ass'n v. Consumer Prod. Safety Comm'n,* 526 F.2d 1368 (2d Cir. 1975). As for the *§ 702* cases cited by the INS that suggest § 702's authorization of judicial review is limited to instances of "agency action" as defined by § 551(13), it is noteworthy that these are all district court decisions which rely on *pre-1976* authority. *See Fagot v. Federal Deposit Ins. Corp.,* 584 F.Supp. 1168, 1178 (D.P.R.1984); *Fund for Animals, Inc. v. Florida Game and Fresh Water Fish Comm'n,* 550 F.Supp. 1206, 1208 (S.D.Fla.1982); *Helton v. United States,* 532 F.Supp. 813, 822 (S.D. Ga.1982); *Pharmaceutical Mfrs Ass'n v. Kennedy,* 471 F.Supp. 1224, 1226–33 (D.Md.1979).

In sum, we reverse the district court's decision that sovereign immunity is a bar to the declaratory and injunctive relief sought by the churches against the United States, the Department of Justice, and the INS.

## IV

### QUALIFIED IMMUNITY

■ The district court held below that the individual INS agents named as defen-

dants are entitled to qualified immunity. We agree.

Federal officials are entitled to qualified immunity for actions taken in the scope of their authority. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed. 2d 396 (1982). Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief. *Id.* at 806, 102 S.Ct. at 2732. Under the doctrine of qualified immunity, federal officials are immune from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (citations omitted). In refining this standard, the Supreme Court has explained:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted).

On appeal, the churches argue that it must have been apparent to INS officials that undercover electronic surveillance of church services without a warrant and without probable cause violated the churches' clearly established rights under the First and Fourth Amendments. We disagree. We find no support in the preexisting case law for the churches' contention that the unlawfulness of the conduct was apparent. *Anderson,* 107 S.Ct. at 3039.

The churches rely on *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), in support of their contention that the alleged INS surveillance of church services violated clearly established rights under the free exercise clause of the First Amendment. In *Everson,* the Supreme Court held that a state statute providing for transportation of parochial school students did not violate the establishment clause of the First Amendment. In passing, the Court in *Everson* noted that the federal government cannot "openly or secretly participate in the affairs of any religious organizations or groups." 330 U.S. at 16, 67 S.Ct. at 512. We cannot agree with the churches' contention that this statement clearly established that the INS' conduct violated the free exercise clause. *Everson* was an establishment clause case, not a free exercise case, and the dicta relied on by the churches regarding the proper relationship of church and state cannot be taken as clearly settling the free exercise issue raised by the churches' First Amendment claim.

We are equally unpersuaded by the churches' argument that the INS conduct at issue here violated clearly established rights under the Fourth Amendment. The churches' reliance on *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967), is of no avail. *Katz* is certainly authority for the general proposition that the Fourth Amendment protects reasonable expectations of privacy. *See id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). It is not authority, however, for the proposition that a reasonable expectation of privacy attaches to church worship services open to the public. The churches' reliance on *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), is no more helpful to their position. *Zurcher* may establish, as the churches assert, that the Fourth Amendment must be enforced with special stringency where First Amendment rights are at stake; but it has little apparent bearing on the question whether the INS infringed a reasonable expectation of privacy in this case. The facts in *Zurcher,* involving a seizure of documents in a newspaper office not generally open to the public, were quite different from the present facts and cannot be said to clearly settle the Fourth Amendment issue in this case.

The churches also argue that INS guidelines requiring agents to obtain authorization for undercover operations concerning the activities of religious organizations

demonstrate that reasonable officials in the individual defendants' position would have known that the alleged INS surveillance of church services was unconstitutional. The relevant INS guidelines state that "undercover operations involving sensitive circumstances must receive prior approval of the Commissioner of the INS or the Associate Commissioner for Enforcement with the concurrence of the Assistant Attorney General for the Criminal Division ..." ER Tab 42, Exhibit 4. "An undercover operation involves sensitive circumstances if there is a reasonable expectation that [it] will concern an investigation of ... the activities of a religious ... organization...." *Id.*

Relying on *Bilbrey v. Brown*, 738 F.2d 1462 (9th Cir.1984), the churches argue that these guidelines should have made INS officials aware that their covert electronic surveillance of the church services without a warrant supported by probable cause abridged both First and Fourth Amendment rights. We believe that *Bilbrey* is inapposite, however, because the regulations in that case put school officials on notice of students' constitutional rights, specifically requiring "probable cause" for a search by school officials. *Id.* at 1466. Here, in contrast, the INS guidelines do not speak to constitutional concerns; rather, the guidelines reflect INS policy regarding undercover operations in a variety of "sensitive circumstances."[10] The guidelines mention neither the Constitution in general nor the First or Fourth Amendment in particular; they do not suggest in any way that the INS policy requiring prior authorization for undercover operations involving religious organizations is based on constitutional concerns. Thus, the INS guidelines cannot fairly be read as putting a reasonable official on notice that undercover surveillance of church services would violate the churches' constitutional rights.

In sum, we agree with the district court that the INS officials named as defendants are immune from liability for money damages. The churches are therefore barred from recovering the damages they seek in this action.

## V

### MOOTNESS AND STANDING TO SEEK INJUNCTIVE RELIEF

■ Our holding that the churches are barred by the doctrine of qualified immunity from recovering money damages in this action raises the question of mootness. A suit for prospective relief against official misconduct may become moot if the official action is discontinued and there is no reasonable expectation that it will recur. *See, e.g., Preiser v. Newkirk*, 422 U.S. 395, 403, 95 S.Ct. 2330, 2335, 45 L.Ed.2d 272 (1975). However, "the burden of demonstrating mootness 'is a heavy one,'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383–84, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953)), and mootness will not be found if the underlying dispute between the parties is "capable of repetition, yet evading review." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976) (quoting *Southern Pacific Terminal Co. v. I.C.C.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)).

A closely related question requiring resolution is whether the churches have standing to pursue injunctive relief. Although we have determined that the alleged INS surveillance produces an injury cognizable for standing purposes, it is a separate question whether the churches have standing to pursue prospective relief against such surveillance; for when injunctive relief is sought, litigants must demonstrate a

---

10. The INS Guidelines enumerate a host of "sensitive circumstances" including: Undercover operations concerning political officials or candidates, activities of foreign governments or officials, and activities of political organizations or the news media; undercover operations conducted outside of the United States; undercover operations in which an undercover agent might participate in transporting illegal aliens, make misrepresentations to third a party, commit a felony, run the risk of being arrested, give sworn testimony, or pose as an attorney, physician, or member of the clergy or newsmedia; and undercover operations requiring the use of appropriated funds. *See* ER Tab 42, Exhibit 4.

"credible threat" of future injury. *La-Duke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir.1985), *modified on other grounds*, 796 F.2d 309 (9th Cir.1986); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Although we believe there is a possibility that this case should be dismissed on standing or mootness grounds, we are, as an appellate court, ill-equipped to decide these questions in the first instance. The issues pertinent to mootness and standing have not been briefed by the parties, either before the district court or on appeal. Moreover, on the limited record before us, we are unable to assess the likelihood that the INS will again engage in the kind of church surveillance challenged in this case. Accordingly, because "[a] wise answer to [the question of likelihood of recurrence] is always bound by the facts of the specific case," Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.3, at 261, we believe the district court is better able to decide the question in the first instance. We are therefore persuaded that the prudent course of action is to remand to the district court for further proceedings, without addressing the churches' constitutional claims on the merits.

If the district court finds that this case is not moot and that the churches have standing to seek prospective relief, the district court may then proceed to adjudicate the merits of the First Amendment claim because of our holding that the churches have standing to raise that claim. If a subsequent appeal is taken, it will be time enough for us to address the merits of the First and Fourth Amendment claims. Prudential considerations dictate that before we confront difficult questions of constitutional law, we should ensure that there is in fact a continuing controversy which requires us to do so. In refraining from deciding the merits of either constitutional claim at this time, we also avoid piecemeal appellate review of constitutional claims arising out of the same nucleus of operative facts.

## CONCLUSION

The judgment below is affirmed in part and reversed in part, and the case is remanded to the district court with instructions to determine whether the case should be dismissed on standing or mootness grounds and, if not, to proceed with the case in a manner consistent with this opinion.