The FUND FOR ANIMALS, INC., a New York Corporation, The Herbert Hoover Environmental Defense Fund, Inc., Jack Kassewitz, The Ad Hoc Committee to Save the Deer, and all others similarly situated, Plaintiffs,

v.

The FLORIDA GAME AND FRESH WATER FISH COMMISSION, an agency or political subdivision of the State of Florida, et al., Defendants.

Civ. A. No. 82–1481–CIV–EPS.

United States District Court,
S.D. Florida,
Civil Division.

Nov. 10, 1982.

Norman Francis Haft, Stuart A. Cohen, Miami, Fla., Douglas Paul Solomon, P.A., Coconut Grove, Fla., for plaintiffs.

Michael Mitchell, Asst. U.S. Atty., Miami, Fla., G. Kenneth Gilleland, Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER DISSOLVING TEMPORARY RE-STRAINING ORDER AND DENYING MOTION FOR PRELIMINARY IN-JUNCTION

SPELLMAN, District Judge.

This cause was before this Court based upon motions for a temporary restraining order, both preliminary and permanent injunctions, and declaratory relief. On July 15, 1982, and July 17, 1982, this Court held hearings and took testimony regarding these matters.

Plaintiffs were seeking to prevent a deer hunt planned to take place over a period of four days in an area of the South Florida Everglades known as Florida State Conservation Area 3A, in Dade and Broward Counties, Florida. (Conservation Area No. 3A is a part of the South Florida Water Conservation District and is state-owned and regulated.) Because of a high water level, a deer herd had become trapped in relatively small areas of high ground in Conservation Area 3A, with limited food resources.

Defendant, Florida Game and Freshwater Fish Commission, proposed the hunt to eliminate what they perceived as serious overcrowding which they predicted would result in starvation of the entire deer population, and other related problems. The four-day hunt, supervised and controlled by the Florida Game and Freshwater Fish Commission, would bring into the northern section of Conservation Area 3A approximately 300 airboats and half-tracks (specially outfitted motor vehicles for travel in swamp or marsh area) containing hunters during the first two days of the hunt. During the last two days of the hunt, approximately 1,000 of the same type vehicles would be in the southern portion of Conservation Area 3A. It was the hope of Florida Game officials that approximately 2,000 deer would be killed, as well as some wild hogs, as a result of the controlled hunt.

Plaintiffs claimed the proposed hunt would violate virtually every Federal environmental statute of any significance and an assortment of Florida environmental statutes. This Court declines pendent jurisdiction as to the state law violations claimed. As to the federal statutes, Plaintiffs claimed prospective violations of: (1) The National Environmental Policy Act (NEPA), 42 U.S.C. Section 4321, et seq.; (2) The Administrative Procedure Act (APA), 5 U.S.C. Section 553, et seq.; (3) The Endangered Species Act, 16 U.S.C. Section 1531, et seq.; (4) The Migratory Bird Act, 16 U.S.C. Section 703, et seq.; (5) The Migratory Bird Conservation Act, 16 U.S.C. Section 715, et seq.; (6) The Fish & Wildlife Coordination Act, 16 U.S.C. Section 661, et seq.; and (7) The Bald and Golden Eagle Protection Act, 16 U.S.C. Section 668, et seq.

Insofar as NEPA, this Court finds that the proposed hunt is to be conducted by State officials on state-owned land and that there is no Federal involvement. Plaintiffs have offered no proof showing that any agencies of the United States Government are either supervising, controlling, participating or funding, in whole or in part, the

proposed deer hunt. For an action to be subject to NEPA, 42 U.S.C. Section 4321, *et seq.;* it must be shown to be "federal" because NEPA operates only upon federal agencies and imposes no duties upon federal agencies for state and local actions, unless those actions are being federally funded, in whole or in part, or are subject to federal supervision or control. *See Edwards v. First Bank of Dundee,* 534 F.2d 1242, 1245–1246 (7th Cir.1976); *Bradford Township v. Ill. State Toll Highway Auth.,* 463 F.2d 537, 540 (7th Cir.1972); *Civic Improvement Committee v. Volpe,* 459 F.2d 957, 958 (4th Cir.1972); *Town of North Hempstead v. Village of North Hills,* 80 F.R.D. 714 (1978). Since the proposed deer hunt is not a Federal action, the Court holds that the requirements of NEPA do not apply.

Similarly, the Court holds that the Administrative Procedure Act (APA), 5 U.S.C. Section 500, *et seq.,* does not apply. The APA established the statutory framework for quasi-judicial operations of a federal administrative agency, as well as the judicial review thereof. Generally, for an action to qualify as being subject to judicial review it must satisfy the APA's statutory definition of "agency action." *See* 5 U.S.C. Section 551(13); *Pharmaceutical Manufacturers Association v. Kennedy,* 471 F.Supp. 1224, 1226–1227 (D.Md.1979). The APA, at 5 U.S.C. Section 551(1) defines agency as "... each authority of the Government of the United States....." By its own terms, the APA is restricted to federal action and thus cannot be extended to cover the proposed deer hunt by the Florida Game and Freshwater Fish Commission, because, no agency of the Federal Government participated in this proposed hunt.

Of the remaining federal conservation statutes urged by the Plaintiffs, this Court determines that the only applicable law is the Endangered Species Act. The remaining statutes either provided no private right of action, were dependent upon federal action or control, were inapplicable in regard to subject matter; or were criminal in nature, under which prospective action could not be enjoined.

▮ Under the citizens' suit provisions of the Endangered Species Act, the Plaintiffs have standing to sue in their own names to seek the protection of this Act for an endangered species. 16 U.S.C. Section 1540(g). Further, it appears that state officials may be sued to enjoin them from violating the provisions of the Endangered Species Act. *See Palila v. Hawaii Dept. of Land and Natural Resources,* 471 F.Supp. 985 (1979), *affirmed,* 639 F.2d 495 (9th Cir. 1981).

The Court, after an emergency hearing on July 15, 1982, found that it had *prima facie* jurisdiction under the Endangered Species Act. Further, it found *prima facie* compliance with the requirements for the issuance of a temporary restraining order as espoused in *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974). The Temporary Restraining Order was granted for a period of thirty-five hours (the hunt, scheduled to begin at 6:00 a.m. on July 16, 1982, was halted until 5:00 p.m. July 17, 1982). During that time, the Court, pursuant to Rule 706, Federal Rules of Evidence, appointed a panel of experts, who were nominated by the respective parties, to view the area in question.

Testimony received from the experts established that the deer in question are Florida white-tail deer, which, although similar to the Key Deer, are not on the endangered species list as are the Key Deer. Further, the testimony established that Florida white-tail deer do not, in fact, interbreed with the Key Deer, although it is physically possible for such interbreeding to occur. It is also physically possible for the Key Deer to interbreed with white-tail deer found in other States. However, due to the Key Deer's isolated habitat on two islands in the lower Keys, it is geographically impossible for such interbreeding to occur in nature, because the herds have no opportunity to mix. Also, no scientific data was presented regarding whether the two herds had ever mixed in the past.

The Endangered Species Act, at 16 U.S.C. Section 1532(16), defines the term "species" as meaning: "any subspecies of fish or

wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife *which interbreeds when mature*." (Emphasis added.) Based upon the testimony, this Court finds that the Florida white-tail deer are not a "species" of Key Deer and they are not entitled to the protection of the Endangered Species Act. Although the Florida white-tail deer have the potential for interbreeding with the Key Deer, they do not in fact do so. The definition of "species" in the Endangered Species Act contemplates *the act of interbreeding* to occur, in fact, during maturity, not the *possibility* that the white-tail deer might someday biblically *know* the Key Deer. 16 U.S.C. Section 1532(16). .

The Court-appointed experts reported that no endangered species were sighted in Conservation Area 3A during their inspection trip by airboat. Plaintiffs' experts, however, stated that in the past there had been occasional sightings of three endangered species in the subject area: the Florida Panther, a mammal; the Everglades Kite, a bird; and, the Indigo Snake, a reptile.

Plaintiffs' experts further testified that the noise from the airboats might cause stress on any endangered species found in the area. It was also developed, however, that this noise stress was no different than that caused by any other noise sources, such as airplanes, and that it was temporary. Further, the two endangered species affected by the noise stress, the Florida Panther and the Everglades Kite, had high mobility and could escape by crossing the Conservation Area boundary and entering Big Cypress National Preserve to the west, or to the Everglades National Park to the south.

Also, Plaintiffs' experts stated that the movement of the airboats through the water-submerged grasses could affect the feeding habits of the Everglades Kite by jarring loose snails attached to the grasses and causing them to sink to the bottom beyond reach of the Everglades Kite.

The Court notes that Plaintiffs have attached to their Complaint an exhibit entitled, "Everglades Wildlife Management Area: 1982–83 Hunt Map and Regulations." This exhibit reflects that the subject area is a "Cooperative Public Hunting Area," which has the following hunting season:

OPEN SEASON

*Archery*—September 11 through October 1 in Conservation Area 3A North only.

*Archery*—September 1 through October 3 in Conservation Area 2 only.

*Muzzleloading Gun*—October 2 through 22 in Conservation Area 3A North only.

*Muzzleloading Gun*—October 9 through 31 in Conservation Area 2 only.

*General Gun*—Walk Hunt—October 23 through 31, in Conservation Area 3A North only.

*General Gun*—Vehicle Hunt—November 13 through 16 and November 20 through 23 in Conservation 3A North, Conservation Area 3A South and Conservation Area 3B only.

*Waterfowl and Snipe*—During established waterfowl and snipe seasons.

*Fishing and Frogging*—Permitted throughout the year.

*Trapping*—Prohibited.

*Camping*—Permitted throughout the year.

Further, this exhibit reflects that airboats and other all-terrain vehicles are common in Conservation Area 3A. The following regulations, as reflected in this exhibit, govern the use of these vehicles in the subject area:

VEHICLES:

16. Vehicles shall not be parked in such a manner as to obstruct roads, gates, or firelanes.

17. Taking or herding wildlife from a moving vehicle is prohibited.

18. Any vehicle used off roads must have a current license tag or off-road vehicle registration decal and validation sticker.

19. Airboats, boats and other vehicles traveling in the area at night must have a stationary light, visible from 360 degrees, at least six feet above the surface of the vehicle or boat.

20. The use or presence of vehicles on deer islands, tree islands, tree stands or in that portion of the area between the old Miami Canal (Mud Canal) and the new Miami Canal is prohibited.

21. During the archery and muzzleloading gun seasons, all vehicles are prohibited in Conservation Area 3A North (except on levees and canals) and in Conservation Area 2 (except on the L–6 levee).

22. During archery and muzzleloading gun seasons, airboats and other vehicles are prohibited in Conservation Area 3A North and Conservation Area 2. Archery and muzzleloading gun equipment may be transported on boats (other than airboats) in Conservation Area 3A North. Access to Conservation Area 2 shall be from the L–6 levee only.

23. During the general gun season, Conservation Area 3A North, Conservation Area 3A South, and Conservation Area 3B are closed to all vehicles, except those authorized by general gun permits.

24. During the general gun walk hunt, three-wheeled vehicles with an engine displacement not exceeding 200 c.c. are permitted.

Because it is a part of the South Florida Water Conservation District,[1] Conservation Area 3A's primary function is the storage and management of water. It is also clear from the above exhibit that the area serves a secondary function as a public hunting area wherein airboats and other all-terrain vehicles are allowed at various locations at regular intervals during the hunting season between September and November of each year.

The Endangered Species Act makes it unlawful for any person to "take any [endangered] species". 16 U.S.C. Section 1538(a)(1)(B). The statute defines "taking" as including to "harass, harm, pursue, hunt, wound, . . . or attempt to engage in any such conduct." 16 U.S.C. Section 1532(14). "Harass" is further defined by regulations

as an intentional or negligent act or omission that significantly disrupts normal behavior patterns of the endangered animals. 50 C.F.R. Section 17.3(c). Similarly, "harm" is defined to include activity that results in significant environmental modification or degradation of the endangered animal's habitat. *See Palila v. Hawaii Dept. of Land and Natural Resources, supra,* 639 F.2d at 497.

Based upon the foregoing, this Court holds that no "taking" of an endangered species has occurred as a result of the four extra days' use of airboats and other all-terrain vehicles in connection with the proposed deer hunt. Assuming that the Florida Panther, the Everglades Kite, and the Indigo Snake presently exist in Conservation Area 3A, there exists in the record an insufficient basis for a finding that use of airboats in this instance will "significantly disrupt normal behavior patterns of the endangered animal." 50 C.F.R. Section 17.3(c). As stated earlier, to the extent that noise from the airboat engine causes stress, it is very temporary and no more stressful than aircraft overhead, and flight is possible to two adjacent National Parks. To the extent that airboat paths created during the four-day period of this emergency hunt have the potential for disrupting normal behavior patterns or degrading the environment, this Court simply does not find it to be "significant" under the circumstances peculiar to this area, especially in light of the fact that this area is crisscrossed by airboats every year when this water conservation area becomes a public hunting ground.

Under the test espoused in *Canal Authority of the State of Florida v. Callaway, supra* at 572, injunctive relief is conditional upon a finding that:

1. There is a substantial likelihood that the Plaintiffs will prevail on the merits;

---

1. The Court cannot help but note that although the conservationists, the Florida Game and Freshwater Fish Commission and the Miccosukee Indians were the "actors" before this

Court, the real author of the drama giving rise to this tragedy was the South Florida Water Management District which caused the area to be flooded.

2. There is a substantial threat that the Plaintiffs will suffer irreparable injury if the injunction is not granted;

3. The threatened injury to the Plaintiffs outweigh the threatened harm that the injunction may do to the Defendants; and

4. The granting of the preliminary injunction will not disserve the public interest.

 Under this test the Court finds: that a substantial likelihood does not exist that Plaintiffs will prevail on the merits, especially in light of this Court's ruling that no showing of a likelihood of a "taking" of an endangered species has occurred; that a substantial threat of irreparable injury to Plaintiffs has not been shown; that the threatened injury to Plaintiffs has not been shown to outweigh the threatened harm to Defendants; and that the granting of injunctive relief in this instance will not best serve the public interest. As to the latter fact, it would appear quite to the contrary.

Accordingly, it is ordered that the temporary restraining order heretofore entered is dissolved, the motion for preliminary injunction is denied, and Defendants are hereby allowed to proceed with the deer hunt.