SIERRA CLUB; The Wilderness Society; Georgia Forestwatch, Inc.; The Amurchee Alliance; The Rabun County Coalition to Save the Forest, Inc.; and Friends of Georgia, Inc., Plaintiffs,

v.

George MARTIN, in his official capacity as Forest Supervisor of the Chattahoochee and Oconee National Forest; Robert C. Joslin, Regional Forester of the United States Forest Service for Regional Eight; and United States Forest Service, Defendants.

Civil Action No. 1:96–CV–926–FMH.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 8, 1996.

1560

Donald D.J. Stack, Office of Donald D.J. Stack, Atlanta, Georgia; Eric E. Huber, Sierra Club Legal Defense Fund, for Plaintiffs.

James Randolph Schulz, Office of the United States Attorney, Northern District of Georgia, Atlanta, Georgia; Kelly E. Mofield, Karen M. Dicke, C. Miles Tolbert, Lois Schiffer, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for Defendant(s).

## ORDER

HULL, District Judge.

This matter is before the Court on the Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction [3–1, 3–2]. After reviewing the record in its entirety and hearing oral arguments of counsel for the parties, the Court hereby GRANTS Plaintiffs' Motion for a Preliminary Injunction [3–2] and finds as follows.

## I. FINDINGS OF FACT

### A. Parties

1.

The Defendant United States Forest Service ("Forest Service") has authorized seven timber projects which will allow private parties to purchase and cut timber in the Chattahoochee and Oconee National Forests in Georgia (the "National Forests"). These timber projects will allow timber cutting, logging, clearcutting, road building, and related activities for seven timber sale areas in the Chattahoochee and Oconee National Forests (the "timber sale areas").

2.

Defendant George Martin is the Forest Supervisor of the Chattahoochee and Oconee National Forests. Defendant Robert C. Joslin is the Regional Forester of the United States Forest Service for Region Eight. These Defendants are the two officials of the Defendant Forest Service who performed or are responsible for the agency actions Plaintiffs challenge in this case.

3.

The Plaintiffs are environmental membership organizations with members who are adversely affected by the actions of the Defendants. Plaintiffs' members lead numerous recreational trips into the Chattahoochee and Oconee National Forests each year.

### B. Procedural History

4.

On April 17, 1996, Plaintiffs filed their Complaint and Motion for Temporary Restraining Order and Preliminary Injunction.

5.

On April 19, 1996, the parties, by consent, stipulated to a 20–day temporary cessation of all tree cutting, logging, and roadmaking in the seven timber sale areas in the National Forests. In lieu of the Court's granting a Temporary Restraining Order, the parties consented to this 20–day temporary cessation of activities and the Court scheduled a hearing for May 1, 1996 on Plaintiffs' Motion for a Preliminary Injunction. On May 1, 1996, the Court reviewed the evidence with the parties and heard oral argument on Plaintiffs' Motion for a Preliminary Injunction. The Court finds that the record establishes the following facts.

### C. Defendants' Timber Sale Projects

6.

The Defendant Forest Service's seven timber projects involve approximately 2,103 acres of forest to be harvested, including logging by clearcutting.

7.

Timber harvesting and road building activity have begun on only two of these seven timber projects. Road building, but no timber harvesting, has begun on a third timber project.

8.

A fourth timber project has been sold, but has not yet been implemented.

9.

The three other timber projects have not yet been offered for sale.

10.

The logging and road building at issue include cutting of hemlock-cove hardwoods and stands with advanced age, over ninety years, that are increasingly rare in the highly modified landscapes in North Georgia.

11.

The timber projects involve the discharge of 275.2 tons of sediment into the river and streams in the National Forests.

12.

The seven timber projects involve building 18 miles of road, some of which are permanent and some of which are temporary. An additional 155.1 tons of sediment are to be discharged to the river and streams from the roads.

### D. APA Claims for Violations of the Migratory Bird Treaty Act

13.

The Chattahoochee and Oconee National Forests are home to numerous species of migratory birds, which typically winter in Mexico or the Caribbean and spend the nest-

ing season, April through August, in these National Forests.

14.

Neotropical migratory song birds designated for protection under the Migratory Bird Treaty Act nest in the seven timber sale areas. The presence of migratory birds in the timber stands to be logged has been witnessed and confirmed.

15.

Over a 25–year span, the numbers of these migratory birds are declining regionally—by as much as 10% for certain species.

16.

A discernible number of migratory birds will be killed directly by the activities of these seven timber projects. The number of broods (nests) that would be killed from the timber cutting activity is estimated between a low of 848 nests and a high of 2,840 nests. There are 3.5 juvenile birds per nest that will be killed. Nests, eggs, and young birds will be destroyed, and adults will abandon sites due to logging and use of heavy equipment. In other words, from 2,000 to 9,000 juvenile migratory birds will be killed directly by Defendants' timber sale projects during nesting season. Defendants do not dispute that cutting down a tree with an active nest in it directly kills the juvenile migratory birds.

17.

The fact that the tree cutting during the nesting season in these seven timber sale areas will result in significant migratory bird death has been confirmed in writing by the Defendant Forest Service's own ecologist for these National Forests. A memorandum, dated August 10, 1995, from Eddie Morris, a Forest Wildlife Biologist for the Defendant Forest Service, admits that these seven timber projects will result in the loss of nests and birds as follows:

I received the copy of comments to the Crop Time Release Proposal. As you requested, I offer the following response to comment # 8, Sierra Club comments to Crop Tree Release proposal:

Comment # 8—The EA [c]ontains no provisions to prevent mortality to neotropical migratory birds from logging activities during the nesting season.

Response—

This comment seems to assume that the Forest Service has an obligation to prevent mortality to neotropical migratory birds during land-disturbing activities. The loss of individual nests and or birds is an unavoidable [sic] cost of any type of land management activity, whether it be agricultural plowing, mowing, road maintenance, lawn maintenance, clearing land for construction, or cutting trees. Although it is not our desire to destroy individual nests, that is an unavoidable result and is an integral part of natural systems. Natural phenomena such as tornadoes, hurricanes, wildfire, microbursts, and drought all destroy individual animals and nests. However, species are adapted to loss of nests or broods either by re-nesting during the same year (ie, [sic] mourning doves), producing many young per brood (ie, [sic] quail, turkey, and waterfowl), nesting over a wide geographic range (ie, [sic] most neotropical migrants), or being long-lived to reproduce over longer periods of time (Red-cockaded Woodpecker).

As land managers, we are concerned with the viability of species and populations, but are incapable of assuring zero mortality to individuals.

However, since this proposal plans crop tree release for the fall and winter months, it will occur outside the nesting season and will have no effect on nesting success. A review of The Land Manager's Guide to the Birds of the South (Hamel, 1992) reveals that the breeding birds of the Southern Appalachian Forests nest during a period from early April thru [sic] late August. Neo-tropical [sic] Migratory Birds nest primarily from early April through late July, with very little nesting occurring in August. Crop Tree Release conducted between September 15 and March 15 will have no significant effect on the nesting success of migratory birds.

(Memorandum from Eddie Morris, August 10, 1995.) In his memo, Wildlife Biologist Morris points out that "breeding birds of the Southern Appalachian Forests nest during a

period from early April thru [sic] late August" and that "neo-tropical [sic] Migratory Birds nest primarily from . early April through late July, with very little nesting occurring in August." Thus, Wildlife Biologist Morris concludes that "Crop Tree Release conducted between September 15 and March 15 will have no significant effect on the nesting success of migratory birds." Thus, migratory bird death will occur during April to August, but can be avoided if these seven timber projects are implemented by Defendants between September 15—March 15, as opposed to April through August.

18.

These Migratory Bird Treaty Act issues were raised in Plaintiffs' administrative appeals of four of the seven timber projects, two of which included the Forest Service memo admitting to causing migratory bird deaths.

19.

Plaintiffs' expert witness opinion on the death of migratory birds also was brought specifically to Defendant Forest Service's attention, and is part of the administrative record, in connection with the South Corn Ridge sale.

## II. CONCLUSIONS OF LAW

### A. Standards for Preliminary Injunctive Relief

■ To establish entitlement to a preliminary injunction in this case, Plaintiffs must establish four elements: (1) a substantial likelihood that Plaintiffs will ultimately prevail on the merits; (2) that Plaintiffs will suffer irreparable harm if the injunction is not issued; (3) that the threatened injury to Plaintiffs outweighs the potential harm to Defendants if the injunction is issued; and (4) that the injunction, if issued, would not be adverse to the public interest. *Granny Goose Foods, Inc., v. Brotherhood of Teamsters Local No. 70*, 415 U.S. 423, 441, 94 S.Ct. 1113, 1125, 39 L.Ed.2d 435 (1974); *Church v. Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994); *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561–62 (11th Cir.1989),

*aff'd*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).

### B. Plaintiffs' Administrative Procedure Act Claim Based On Violations Of The Migratory Bird Treaty Act

Plaintiffs have filed claims under the Administrative Procedure Act ("APA") and are seeking preliminary injunctions pursuant to those claims. Under the APA, a plaintiff can seek judicial review of any final agency action found to be "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs claim that the Defendant Forest Service's action was "not in accordance with the law" because Defendants' timber projects violate, *inter alia*, the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–712.

#### 1. Plaintiffs Have Shown Defendants Violated Migratory Bird Treaty Act

■ The Migratory Bird Treaty Act ("MBTA") makes it unlawful for any person, "in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell ... or export, any migratory bird...." 16 U.S.C. § 703. Plaintiffs contend that the Defendant Forest Service's timber contracts violate the MBTA because the timber contracts allow timber cutting during the migratory bird nesting season and that cutting the trees during nesting season directly kills at least 2,000 to 9,000 migratory birds—specifically, neotropical song birds. Because Defendants' actions violate the MBTA, Defendants' actions are "not in accordance with law" under the APA. Further, because the above facts establishing violations of the MBTA are in large part undisputed, Plaintiffs have shown a substantial likelihood of success on their APA claim based on violations of the MBTA.

■ The Court finds that a taking or killing does not occur simply because of habitat destruction or modification. *See Seattle Audubon Society v. Robertson*, 1991 WL 18009991156868 (W.D.Wash.1991), *aff'd sub nom. Seattle Audubon Society v. Evans*, 952 F.2d 297 (9th Cir.1991). In this case, however, a killing of young migratory birds occurs because Defendants are allowing tree cutting

and logging during nesting season. *See Sierra Club v. United States Dep't of Agriculture,* No. 94–CV–4061–JPG (S.D.Ill. Sept. 25, 1995) (finding that logging during nesting season created a logical assumption that migratory birds would be killed and, thus, violated the MBTA); *United States v. Darst,* 726 F.Supp. 286 (D.Kan.1989); *United States v. FMC Corp.,* 572 F.2d 902 (2d Cir.1978) (killing migratory birds by toxic and noxious waters violated MBTA); *United States v. Corbin Farm Service,* 444 F.Supp. 510 (1978), *aff'd* 578 F.2d 259 (9th Cir.1978) (application of pesticide to field caused death of 1,000 migratory ducks and violated MBTA). In the *Corbin Farm* case, the district court found that hunting migratory birds is not the sole concern of the MBTA, especially since song birds and other birds not commonly hunted are protected by the Act and since the Act refers to killing "by any means," as follows:

> It is undeniable that Congress was concerned with hunting and capturing migratory birds when it enacted the MBTA; the legislative history confirms this concern. The fact that Congress was primarily concerned with hunting does not, however, indicate that hunting was its sole concern. Paring the language of § 703 down to its essentials, the section makes it illegal "at any time, by any means or in any manner, to ... kill ... any migratory bird ..." The use of the broad language "by any means or in any manner" belies the contention that Congress intended to limit the imposition of criminal penalties to those who hunted or captured migratory birds. Moreover, a number of song birds and other birds not commonly hunted are protected by the conventions and so by the Act.

*Corbin Farm,* 444 F.Supp. at 532.

The decision in *Sierra Club v. USDA,* No. 94–CV–4061–JPG, (S.D.Ill. Sept. 25, 1995) is directly on point. There the Forest Service had set aside certain management areas in the Shawnee National Forest in Illinois and protected them from logging activities during the migratory bird nesting season (in Georgia, that is April through August). However, the Forest Service had not prohibited logging in other areas, despite knowing that migratory birds were present there during the nesting season. The Court found that plaintiffs had presented a "logical assumption" that forest interior birds "will be killed" without "seasonal restrictions" on logging in the non-protected areas. It therefore remanded the matter to the Forest Service to address the issue of whether its Management Plan would violate the MBTA by allowing logging, i.e., the killing of migratory birds, during the nesting season. *Id.* at 35.

Similarly, in the instant case, the killing of migratory birds constitutes a violation of the MBTA; and the instant case is even stronger than *Sierra Club v. USDA,* since in this case Plaintiffs have affirmative evidence of the number of deaths that will occur and are not merely relying upon assumptions. In the instant case, the evidence affirmatively shows that thousands of migratory birds will be killed directly by cutting down the trees with nests and juvenile birds in them. Thus, Defendants' actions clearly violate the MBTA.

Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction does not appear to contest that tree cutting kills migratory birds in violation of the MBTA. In fact, the memo from Defendants' own biologist confirms that tree cutting during nesting season will kill migratory birds. Instead, Defendants primarily contend that even if Defendants are violating the MBTA, the Court lacks jurisdiction to hear Plaintiffs' claim and thus Plaintiffs cannot sue for Defendants' violations of the MBTA due to several jurisdictional problems. First, Defendants contend that this Court has no subject matter jurisdiction over Plaintiffs' claim because the MBTA does not contain a citizen suit provision, and is a criminal statute which creates no private right of action. Second, Defendants contend that even if their actions are not in accordance with law because they violate the MBTA, the Court still does not have subject matter jurisdiction over Plaintiffs' claim because Defendants have no duty to act in accordance with the MBTA. Third, Defendants contend that assuming *arguendo* this Court does have subject matter jurisdiction, Plaintiffs do not have standing to bring any claim pursuant to the MBTA. Finally, Defendants argue that

the MBTA does not sanction the relief that Plaintiffs seek in this case. The Court will discuss each of Defendants' contentions in turn.

### 2. The MBTA Does Not Create a Private Citizen Right of Action

██ Defendants devote a substantial portion of their brief to arguing that there is no private right of action under the MBTA. However, during oral argument on Plaintiffs' Motion for Preliminary Injunction, Plaintiffs clarified again that they are not attempting to state a cause of action brought under the MBTA. Rather, insofar as the MBTA is concerned, Plaintiffs state a claim only under the APA, with the MBTA serving as the predicate law with which Defendants' actions are not in accordance. To the extent Plaintiffs are attempting otherwise, the Court finds that Defendants' contention is correct and that the MBTA does not create a private right of action under the MBTA.

### 3. Plaintiffs Can Sue Under the APA for Defendants' Violations of the MBTA

██ Even if Plaintiffs are proceeding under the APA, Defendants also challenge the Court's subject matter jurisdiction under the APA on two grounds. First, Defendants argue that the MBTA is a criminal statute whose enforcement is within the discretion of the Fish and Wildlife Commission. According to Defendants, Plaintiffs cannot enforce collaterally the terms of the MBTA through the APA. Second, Defendants contend that assuming *arguendo* the MBTA can be enforced collaterally through the APA, such a claim can be sustained only if the particular agency sued as a Defendant had an affirmative duty under the MBTA and acted pursuant to its duties under the MBTA.

Regarding Defendants' first contention, the Court is guided by the United States Supreme Court's decision in *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Petitioner Chrysler Corporation sought to enjoin the Department of Defense's Defense Logistics Agency ("DLA") from disclosing reports on affirmative action programs which Chrysler was required to submit to the DLA pursuant to regulations promulgated by the United States Department of Labor's Office of Federal Contract Compliance Programs. Third parties had made Freedom of Information Act ("FOIA") requests for these reports, and the DLA notified Chrysler that the DLA intended to disclose the reports. The FOIA, among other things, compels government agencies to disclose certain information upon request. However, the act contains nine exemptions. The reports requested by the third parties fell within one of the nine exemptions.

Chrysler based its request for relief on two theories. First, Chrysler contended that because the third parties' requests concerned information exempted by the FOIA, the DLA was required to withhold such information. The Supreme Court rejected that contention, finding that the FOIA is exclusively a disclosure statute. Its purpose is to require government agencies to disclose certain types of information. While the FOIA's exemptions release government agencies' obligations to disclose limited categories of information, it does not create an affirmative duty to withhold any type of information. Accordingly, the Supreme Court held that Chrysler's claim under the FOIA was meritless.

Chrysler's second ground for relief was based on the Trade Secrets Act, 18 U.S.C. § 1905. Chrysler contended that because the DLA's action violated the Trade Secrets Act, a criminal statute prohibiting the disclosure of certain types of information, the DLA's action was not in accordance with law under the APA.

In disposing of Chrysler's claim, the Supreme Court considered whether the Trade Secrets Act created a private right of action under which Chrysler could be accorded relief. In finding that it did not, the Supreme Court noted "that the Court has rarely implied a private right of action under a criminal statute." *Chrysler*, 441 U.S. at 316, 99 S.Ct. at 1725. The Supreme Court continued that under the factors outlined in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), there was no indication that Congress intended to create a private cause of action under the Trade Secrets Act. *Chrysler*, 441 U.S. at 316–17, 99 S.Ct. at 1725.

However, the Supreme Court next posited that "[w]hile Chrysler may not avail itself of any violations of the provisions of § 1905 in a separate cause of action, any such violations may have a dispositive effect on the outcome of judicial review of agency action pursuant to § 10 of the APA." *Id.* at 317, 99 S.Ct. at 1725. Section 10(a) of the APA provides that "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action ..., is entitled to review thereof." 5 U.S.C. § 702; *Chrysler,* 441 U.S. at 317, 99 S.Ct. at 1725, *see also Oregon Natural Resources Council v. United States Forest Service,* 834 F.2d 842, 851 (9th Cir.1987) ("[A]n implied right of action under a violated statute is not a necessary predicate to a right of action under the APA."). Implicit in this statement, taken in context with the entire opinion in *Chrysler,* is the notion that any person adversely affected by an agency's violation of a criminal statute can obtain judicial review of that agency's action via the APA.

Moreover, in writing the opinion for the unanimous Court, Justice (now Chief Justice) Rehnquist quoted the provision of the APA stating that "a reviewing court shall hold unlawful and set aside any agency action ... not in accordance with law," 5 U.S.C. § 706(2)(A). Justice Rehnquist concluded that "[f]or the reasons previously stated, we believe any disclosure that violates § 1905 [of the Trade Secrets Act] is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)." *Chrysler,* 441 U.S. at 318, 99 S.Ct. at 1726.

Thus, under *Chrysler,* Plaintiffs here can enforce the MBTA through the APA, even notwithstanding the fact that the MBTA is a criminal statute which creates no private right of action. It is undisputed that Defendants' actions during nesting season will result directly in the deaths of thousands of migratory birds in the Chattahoochee and Oconee National Forests. Thus, Defendants' actions violate the provisions of the MBTA. Because Defendants' actions constitute violations of the MBTA, they are "not in accordance with law" within the meaning of 5 U.S.C. § 706(2)(A) of the APA. Accordingly, this Court is vested with the jurisdiction, under the APA, to set Defendants' action aside, and *a fortiori,* to grant preliminary injunctive relief against Defendants.

As for Defendants' contention that this Court has jurisdiction over Plaintiffs' claims based on the MBTA only if Defendants had acted pursuant to the MBTA, such contention also is belied by *Chrysler.* In *Chrysler,* notwithstanding the fact that the DLA's action was not pursuant to the Trade Secrets Act, the Supreme Court held that the DLA's actions were not in accordance with law and thus subject to being set aside. In other words, at least insofar as criminal statutes are concerned, the law does not have to compel a certain course of action for an agency's action to be "not in accordance" with that law. To be sure, most criminal statutes proscribe conduct as opposed to prescribing conduct. Necessarily, when any person, including an agency, violates the provisions of a criminal statute, that person's actions are not in accordance with that law.

Defendants rely mainly on four decisions to support their position that Plaintiffs cannot sue under the APA for violations of the MBTA unless Defendants' actions in issue were taken pursuant to the MBTA. *See Defenders of Wildlife v. EPA,* 882 F.2d 1294 (8th Cir.1989); *Alaska Fish & Wildlife Fed'n & Outdoor Council v. Dunkle,* 829 F.2d 933 (9th Cir.1987), *cert. denied,* 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988); *Fund for Animals v. Florida Game & Fresh Water Fish Comm'n,* 550 F.Supp. 1206 (S.D.Fla. 1982); *Defenders of Wildlife v. Andrus,* 428 F.Supp. 167 (D.D.C.1977) (hereinafter "*Andrus*"). However each of these decisions is inapplicable here. Moreover, if anything, these decisions show that citizens may sue under the APA for violations of the MBTA.

For example, in *Defenders of Wildlife v. EPA,* 882 F.2d 1294 (8th Cir.1989), the plaintiffs sued under § 704 of the APA claiming that the EPA's approval of pesticides containing strychnine was killing migratory birds in violation of the MBTA. The Eighth Circuit held that review under the APA was precluded because the EPA had approved the pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), which authorized the EPA to regulate pesti-

cides. Thus, plaintiffs were required to proceed under the express judicial remedies provided in FIFRA, instead of proceeding under the APA. Although the APA allows suits to challenge agency actions not in accordance with the law, the Court noted that § 704 of the APA provides, "agency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review." *Id.* at 1302 (quoting 5 U.S.C. § 704) (emphasis supplied). Because FIFRA provides a specific framework for obtaining judicial review, there was an adequate remedy at law and the district court had no jurisdiction to consider the claims under the APA. *Id.* Plaintiffs may sue under the APA only when the statute violated (FIFRA in *Defenders of Wildlife* and MBTA here) does not provide an adequate remedy in court.

If anything, the *Defenders of Wildlife* decision supports Plaintiffs' right to sue under the APA for violations of the MBTA because the MBTA itself does not provide for any judicial review by Plaintiffs. In contrast, the plaintiffs in *Defenders of Wildlife* could not sue under the APA because the FIFRA expressly provided for judicial review of the agency's regulations approving the pesticides in issue. Since there was an adequate remedy in FIFRA for agency review, the plaintiffs were not required to resort to review of agency action under the APA. In contrast, just the opposite is true here.

Defendants also rely upon the decision in *Fund for Animals v. Florida Game & Fresh Water Fish Comm'n,* 550 F.Supp. 1206 (S.D.Fla.1982), but there the action of a state agency and not a federal agency was challenged under the APA. The district court in that case correctly pointed out that the APA is restricted to action by a federal agency and could not be extended to cover a proposed deer hunt by the Florida Game and Fresh Water Fish Commission, a state agency.

Finally, Defendants stress two decisions which have allowed citizen suits under the APA for violations of the MBTA: *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle,* 829 F.2d 933 (9th Cir.1987), and *Defenders of Wildlife v. Andrus,* 428 F.Supp. 167 (D.D.C.1977). Defendants emphasize that both cases were allowed against the federal Fish and Wildlife Service because it is charged with issuing regulations setting the conditions under which certain migratory birds may be hunted. In *Andrus,* the district court found that the Fish and Wildlife Service's hunting regulations for the migratory birds were arbitrary and unlawfully violated the MBTA. In *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle,* the issue again concerned the regulations for hunting of migratory birds and whether those regulations contravened certain treaties with Canada, Mexico, and other countries. In both cases, the courts discussed the Fish and Wildlife's regulations under the MBTA because they were the subject of the plaintiffs' complaints in those two cases. The courts in those two cases nowhere stated that the Fish and Wildlife Service is the only federal agency that can be sued for violations of the MBTA. If anything, these two cases, brought under the APA, show that citizens can sue government agencies under the APA for violating the MBTA.

Defendants also emphasize that the Eighth Circuit, in the above *Defenders of Wildlife* pesticide case, held that the plaintiffs' claims should have been brought under FIFRA and not under the APA, and further pointed out that these two above MBTA "cases, however, deal with challenges to agency action taken under the particular wildlife statute in question.... Thus, they reflect the traditional manner in which the APA has been used." *Defenders of Wildlife,* 882 F.2d at 1302. From this dicta statement, Defendants argue that the instant case cannot be brought against the Forest Service because the Defendant Forest Service does not have any affirmative duties under the MBTA and thus its actions challenged here were not taken under the MBTA. First, Defendants emphasize this statement by the Eighth Circuit out of context. This statement by the Eighth Circuit was made in the context of determining whether the plaintiffs could sue the EPA for approving the use of the pesticide with strychnine under the APA or FIFRA. Since FIFRA imposed a duty on the EPA to regulate pesticides and expressly provided for

judicial review of the EPA's decisions under FIFRA, the Eighth Circuit held that plaintiff should have sued the EPA under FIFRA instead of the APA. The Eighth Circuit's characterization of these two MBTA cases as the traditional way an agency is sued was used to show that the challenge to the EPA's pesticide regulations should be under FIFRA as opposed to the APA because the EPA was acting under FIFRA. This is totally different than saying an agency cannot ever be sued for violating a law unless it was acting pursuant to that law and charged with enforcing that law (which the Eighth Circuit decision never states). Again, if anything, these two MBTA cases show that Plaintiffs here can sue for violations of the MBTA under the APA.

Finally, and notably, in *Defenders of Wildlife*, the Eighth Circuit recognized that there was considerable support for the plaintiffs' position that the plaintiffs could enforce collaterally the terms of another statute through § 706 of the APA. *Id.* at 1302. Indeed, the Eighth Circuit cited *Chrysler. Id.* Because the Supreme Court held that Chrysler could enforce the terms of the Trade Secrets Act, even though the DLA took no actions under the Trade Secrets Act, and because the Eighth Circuit did not attempt to distinguish *Chrysler*, this Court does not read the Eight Circuit's opinion as establishing the rule Defendants claim it does.[1]

### 4. Plaintiffs Have Standing to Challenge Defendants' Violations of the MBTA

■ Defendants also challenge Plaintiffs' standing to bring any claims based on the MBTA. However, the Court finds that in this case Plaintiffs clearly have standing and that Defendants' contention to the contrary is without merit.

The Supreme Court has recognized that the provision of the APA authorizing a person to seek judicial review of an agency action if that person has suffered a legal wrong or has been adversely affected or aggrieved by an agency action defines when a person has standing for purposes of bringing a claim under the APA. *See, e.g., Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.,* — U.S. —, — – —, 115 S.Ct. 1278, 1283–84, 131 L.Ed.2d 160 (1995); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990); *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985). A finding of standing is typically contingent on a plaintiff's showing (a) a personal injury, (b) that is fairly traceable to the defendant's conduct, and (c) which is likely redressed by the relief the plaintiff seeks. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974); *Shanty Town Assocs. Ltd. Partnership v. EPA,* 843 F.2d 782, 788 (4th Cir. 1988); *Alaska Fish & Wildlife Federation v. Dunkle,* 829 F.2d 933, 937 (9th Cir.1987); *Choctaw Mfg. Co. v. United States,* 761 F.2d 609, 615 (11th Cir.1985). Each of these prongs is satisfied with a showing that a plaintiff is adversely affected by an agency action, when that plaintiff's requested relief is to set aside the very action by which the plaintiff was aggrieved.

To establish that they have been aggrieved or adversely affected within the meaning of the APA, Plaintiffs must show that they have interests which have been adversely affected by Defendants' actions here and that Plaintiffs' interests were within the zone of interests sought to be protected by the MBTA.[2]

---

1. Alternatively, it appears to the Court that Defendants' issuance of the timber sale contracts was done pursuant to the National Forest Management Act and that Act requires Defendants to act in accordance with applicable laws. Thus, Defendants' violation of the MBTA also appears to violate the National Forest Management Act and Plaintiffs can sue under the APA for violations of the National Forest Management Act. The Court requests the parties to brief this issue as well.

2. In addition to the above three constitutional elements for a showing of standing, the Supreme Court also has established certain prudential limitations for standing. These limitations include: (1) a requirement that a plaintiff's alleged injury be arguably in the zone of interests protected by the statute or regulations alleged to be violated, and (2) that the alleged injury not be a generalized grievance shared by a large class of citizens. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct.

**1570**

See *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *R.T. Vanderbilt Co. v. Occupational Safety & Health Review Commission*, 708 F.2d 570, 577 (11th Cir.1983); *Baker v. Bell*, 630 F.2d 1046, 1051 (5th Cir. 1980). The Court finds that Plaintiffs have made both showings.

As the Ninth Circuit stated in *Alaska Fish & Wildlife Federation v. Dunkle*, 829 F.2d 933 (9th Cir.1987), "[c]ourts have found personal injury in a variety of settings in which recreational uses of natural resources are at stake." *Id.* at 937; *see also United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). Thus, Plaintiffs merely must "allege use of the resources in a way that will be significantly affected by the proposed actions." *Id.; see also Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Plaintiffs' Complaint alleges that Plaintiffs have various recreational, aesthetic, business and/or environmental interests that have been and will be adversely affected by Defendants' actions.

Paraphrasing the Ninth Circuit's opinion in *Alaska Fish & Wildlife Federation*, Plaintiffs' Complaint reasonably can be inferred to allege that a decrease in the number of certain species of migratory birds will cause harm to the environment. The harm will cause injury those who wish to photograph, observe, or carry out scientific studies on the migratory birds. The Court finds that Plaintiffs' interests are significant, that they will be and have been adversely affected by Defendants' actions, and that Plaintiffs' interests are within the zone of interests Congress sought to protect in enacting the MBTA. *Alaska Fish & Wildlife Federation*, 829 F.2d at 937; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63, 112 S.Ct. 2130, 2137–38, 119 L.Ed.2d 351 (1992) ("Of course, the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Further the Court finds that Plaintiffs' injury is not a generalized grievance shared by a large class of citizens. Thus, the Court finds that Plaintiffs' have standing to bring their claim based on the MBTA.

**5. Relief Sought by Plaintiffs is Sanctioned by the APA**

Finally, Defendants argue that the relief Plaintiffs seek, an injunction, is not sanctioned by the MBTA. Defendants, in making this argument, apparently misapprehend the statute under which Plaintiffs seek relief. Plaintiffs do not seek relief under the MBTA. Rather, Plaintiffs seek relief under the APA because Defendants' actions are not in accordance with law—namely, the MBTA. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (where Chrysler sought relief under APA because the DLA's actions were not in accordance with the Trade Secrets Act, a criminal statute; the relief Chrysler sought, to set aside the agency action, clearly was not sanctioned expressly by the Trade Secrets Act). Because the APA sanctions the relief Plaintiffs request, Defendants' argument is without merit.

In sum, the Court finds that Defendants' arguments are without merit and that Plaintiffs have shown a substantial likelihood of success on the merits of their claim based on the MBTA.

**6. Plaintiffs Will Suffer Irreparable Harm if an Injunction Does Not Issue in this Case**

Defendants also argue that any harm Plaintiffs might suffer in connection with violations of the MBTA is not irreparable. Defendants contend Plaintiffs have not shown irreparable harm because "[t]he death of a few members of an abundant species does not cause an irreparable injury to the species, because a viable species remains to

2197, 2205, 45 L.Ed.2d 343 (1974). Thus, by construing the "adversely affected" language in the APA to include a showing that the injury alleged by a plaintiff is within the zone of inter-

ests protected by the statute, the Supreme Court also has interpreted the "adversely affected" language of the APA to include the prudential limitations for standing.

reproduce and thrive. At most, there would be nesting failures and the death of some young birds in the small areas involved in this suit." (Defendant's Brief, p. 51). This argument misapprehends the nature of irreparable harm.

 The question of irreparable injury does not focus on the significance of the injury, but rather whether the injury, irrespective of its gravity, is *irreparable*—that is, whether there is any adequate remedy at law for the injury in question. *See Northeastern Fla. Chapter v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974). In the instant case, once the migratory birds are killed, they cannot be returned. More importantly, no monetary award can recompense Plaintiffs for the birds' deaths. Thus, there is no adequate remedy at law for Plaintiffs' injuries.

Even if irreparable injury depends upon how expansive or how large the injury is (as opposed to whether it is irreparable), nowhere in the text of the MBTA does it state that a violation of its mandate is contingent upon a finding of a killing of a certain percentage of the migratory bird population in a particular location. *See United States v. FMC Corp.*, 572 F.2d 902, 903 (2d Cir.1978) (sustaining conviction where one of the twelve counts charged only alleged a killing of one migratory bird). To the contrary, the text of the statute proscribes any killing of any migratory bird. Since the protection of migratory birds apparently was important enough to Congress to proscribe any killing of any migratory bird, the Court finds that the potential killing of 2,000 to 9,000 migratory birds is more than sufficient to show significant irreparable harm. Also, Plaintiffs' evidence shows some species of migratory birds are indeed declining each year. At an irreducible minimum, the Court does not accept the proposition that a violator of the law

can choose the extent to which it violates a law before its actions are subject to review, i.e., a violator's actions cannot be reviewed if it kills only 9,000 birds, but can be reviewed only if its illegal killing affects the viability of the species. For these reasons, the Court finds that Plaintiffs have shown a substantial probability of irreparable harm.

### 7. Balancing of Harms Favors Issuing a Preliminary Injunction in this Case

 Defendants contend that any interests Plaintiffs may assert in this litigation are outweighed by Defendants' competing interests. Namely, Defendants assert that an injunction in this case will interfere with the Defendant Forest Service's ability to manage the forests. However, the Court finds that this interest is outweighed by Congress's interest in protecting migratory birds.

The Court finds that the Forest Service will suffer little, if any, harm if an injunction should issue in this case. The timber harvested in the Southern Appalachian national forests constitutes less than 1% of the timber harvested in the five state region. Also, the timber at issue here is only a small percentage of that less than 1%. Thus, any affect on the Defendants' ability to manage the forests is *de minimis* and is outweighed by the irreparable harm discussed above that Plaintiffs will suffer if an injunction does not issue.

Moreover, only three of the seven contracts have been awarded and tree cutting has begun under only two of those three contracts. In addition, Defendants' timber contracts contain an express provision which allows Defendants unilaterally to suspend execution of the timber contracts under a number of situations, as follows:

> Seller may, by written notice, terminate this contract when it is in the best interest of Seller (as the Government) to do so, and for any of the following reasons:
>
> (a) for the protection of Cultural Resources;
>
> (b) for habitat protection of Threatened and Endangered Species;
>
> (c) to avoid serious environmental damage if the Chief of the Forest Service deter-

mines such could result from Purchaser's operations;

(d) if the contract is significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;

(e) to comply with a court order, upon determination that the order would be applicable to the conditions existing on this sale;

(f) by agreement with Purchaser, upon Seller's determination that such termination is to the advantage of the Government, or not prejudicial to its interests.

Timber Contract, Plain.Exh. D. Thus, Defendants have anticipated the possibility of situations arising which may affect the execution of the timber contracts and, therefore, are not harmed significantly thereby. The anticipation of interruptions in the execution of the contracts was especially acute in this case where Plaintiffs have objected to the award of these particular timber contracts throughout the administrative processes for these timber contracts.

As for Defendants' timber contracts yet to be awarded, Defendants will suffer very little, if any, harm if the timber contracts are enjoined. For reasons discussed above, the Court finds that minimal harm will occur from enjoining Defendants' timber contracts during nesting season. It is noteworthy that the memo from Defendants' own biologist assumed the tree-cutting, logging, and clear-cutting would not occur during nesting season.

Finally, the text of the MBTA permits certain "takings" of migratory birds pursuant to regulations promulgated under the MBTA. Defendants do not allege that they have obtained permission to kill migratory birds under the MBTA regulations. It is not clear whether Defendants attempted to procure permission under these regulations and were denied permission, whether Defendants ever sought permission, or whether the regulations clearly would not permit the "takings" at issue here. To the extent that Defendants could have sought permission to impact negatively the population of migratory birds in the Chattahoochee and Oconee National For-

ests and did not, it is Defendants' failure to get permission to kill the migratory birds, and not this injunction, that interferes with Defendants' ability to manage the forests. To the extent that the regulations would not have permitted the Defendant Forest Service to impact negatively the migratory bird population, Defendants' interests are outweighed by Plaintiffs' interests.

In any event, the Court finds that Plaintiffs have shown that a balancing of interests supports granting an injunction in this case.

### 8. *Public Interest Favors Issuing a Preliminary Injunction in this Case*

Defendants also argue that the public interest dictates that no preliminary injunction should issue in this case. Specifically, Defendants contend that the award of timber contracts contributes to the local economy and that enjoining the sale of timber will affect the regional timber supply. As for Defendants' assertion that the award of timber contracts contributes to the local economy, this interest is outweighed by the public interest in preserving vital aspects of the environment. Once the trees in the National Forests are cut down, they will take years to grow back, and the birds that will be killed cannot be replaced. Additionally, the public has an interest in preventing Defendants from acting in manners inconsistent with the applicable law.

As for Defendants' contention that halting the sale of timber will affect the regional timber supply, the Court notes that the timber harvested in Southern Appalachian national forests represents less than 1% of the total cut from the five state region. Further, the timber sales involved here represents only a small portion of that less than 1%. Accordingly, the Court finds that public interest favors the issuing of a preliminary injunction in this case.

### III. CONCLUSION

The Court GRANTS Plaintiffs' Motion for a Preliminary Injunction [3–1, 3–2] for the following reasons:

(1) There is a substantial likelihood that Plaintiffs will ultimately prevail on the merits

of Plaintiffs' claims that Defendants are violating the Migratory Bird Treaty Act at present and up until September 15, 1996;

(2) Plaintiffs will suffer irreparable injury if the injunction is not issued;

(3) The threatened injury to the Plaintiffs outweighs the potential harm to the opposing parties; and

(4) The injunction would not be adverse to the public interest.

**IT IS HEREBY ORDERED,** in regards to the seven Chattahoochee–Oconee National Forest timber projects named Dunaway Gap, Tibbs Trail, Upper Swallows Creek, Compartment 05, Compartment 59, Big Net, and South Corn Ridge, that Defendants: (a) cause the cessation of all timber-cutting and road building activities from this date continuously to and through September 15, 1996; (b) not permit the commencement or continuation of those activities from this date continuously to and through September 15, 1996; and (c) not offer any of those projects that are unsold up for sale from this date continuously to and through September 15, 1996.

This injunction applies to Defendants, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert with them who receive actual notice of this Order. This injunction will remain in effect continuously to and through September 15, 1996.

The Court's granting Plaintiffs' Motion for Preliminary Injunction based on Defendants' violations of the MBTA pretermits the need for the Court to address, especially in this limited time frame, Plaintiffs' other claims based on Defendants' alleged violations of the Clean Water Act and the National Forest Management Act. However, the Court retains jurisdiction over these additional claims, is continuing its review and analysis of these two remaining claims, and directs the parties to file any additional briefs for the Court to consider on the question of additional preliminary injunctive relief as to these two remaining claims no later than May 24, 1996. Since the parties filed their original Briefs somewhat simultaneously, it will be helpful if each party now files reply briefs regarding the two remaining claims, as well as more detailed proposed findings of fact and conclusions of law regarding the two remaining claims.

The Court also directs Plaintiffs to file any Amendments to their Complaint no later than May 20, 1996. Defendants may file any Amendments to their Answers no later than May 24, 1996. All parties shall respond to the Motion to Intervene by May 14, 1996, and shall submit proposed Orders with findings of fact and conclusions of law regarding the Motion to Intervene. Due to the expedited nature of the case, all parties shall serve all pleadings by hand-delivery to opposing parties and the Court.

In the Court's Order ruling on the pending Motion to Intervene, the Court will schedule another hearing for early June, 1996 for additional oral argument on the issue of preliminary injunctive relief on Plaintiffs' remaining two claims. Since the preliminary injunction issued in this Order expires on September 15, 1996, the Court will rule on the Plaintiffs' Motion for a Preliminary Injunction on the remaining two claims well prior to that date.